No. 83,302

WILLIAM P. MOORE III, *Appellee*, v. BIRD ENGINEERING COMPANY, P.A., *Appellant*.

(41 P.3d 755)

Opinion filed March 8, 2002.

*John E. Taylor*, of Slattery & Rawson, P.C., of Kansas City, Missouri, argued the cause and was on the brief for appellant.

*Lee R. Hardee III*, of Hardee & Peterson, LLC, of Overland Park, argued the cause and was on the brief for appellee.

The opinion of the court was delivered by

ALLEGRUCCI, J.: William P. Moore, III, contacted Bruce Bird, an engineer, regarding his ability to design a bridge that would meet Moore's needs. Moore sued Bird Engineering Company, P.A., (Bird Engineering) alleging defects in Bird's design for a bridge built on Moore's residential property. After a bench trial, the district court entered judgment in favor of Moore. The district court found against Bird Engineering for breach of contract, breach of express warranty, violation of the Kansas Consumer Protection Act (KCPA), and negligence. Bird Engineering appealed. Disagreeing with the district court's view that Bird Engineering engaged in a deceptive act or practice in violation of the KCPA, the Court of Appeals affirmed the judgment in part, reversed in part, and vacated in part. This court granted Moore's petition for review and Bird Engineering's cross-petition for review.

On appeal to the Court of Appeals, Bird Engineering argued that there was a lack of substantial competent evidence supporting the district court's conclusion that it engaged in a deceptive act or practice under the KCPA. The Court of Appeals disagreed with the district court's conclusion that motive was immaterial to a violation of K.S.A. 50-626(b)(1) and, therefore, agreed with Bird Engineering that the district court's failing to find "intent to deceive" was erroneous.

In these circumstances and because the court does not weigh conflicting evidence, pass on credibility, or redetermine questions of fact, *Garvey Elevators, Inc. v. Kansas Human Rights Comm'n*, 265 Kan. 484, 496-97, 961 P.2d 696 (1998), the district court's findings of fact appropriately furnish the basis for the following statement of facts:

In early 1993, Moore began a search for a home site in the country. His ex-wife, who was a real estate agent, located the property he ultimately purchased, through which Wolf Creek runs. Moore was interested in the property if an appropriate bridge could be built across the creek to the proposed home site.

Moore's ex-wife made the initial contact with Bird. Hoping to make the sale at a price Moore would agree to, she indicated to Bird that she was looking to see if a bridge could be built for $20,000, at which price she said she could make the sale to Moore.

Subsequently, Moore and Bird met directly to discuss getting a cost estimate together for a bridge. Bird claims that his understanding from his initial meeting with Moore's ex-wife was that the bridge would only need to be able to carry a single car to the home site—a separate, low-water bridge elsewhere on the property could be used for trucks or other, heavier vehicles. Bird contends that this was also the explicit or implicit understanding in his discussions with Moore. Bird testified that the first discussion he had with Moore regarding specific weight capacities did not occur until sometime in mid-to late 1994, after Moore had consulted with the engineering firm of Shafer, Kline & Warren, P.A. (Shafer, Kline) about the project. The exact date of the first discussion between Moore and Bird about weight requirements is unknown. The district court concluded that Bird's recollection was in error and that weight requirements were discussed between them, at the latest, before Bird proceeded to develop detailed engineering plans for construction of the bridge.

Moore's initial request to Bird Engineering was to prepare a preliminary cost estimate for a bridge that would provide access to the home site even during periods of very heavy rain, specifically sufficient to allow access at the 100-year flood level. Bird Engineering agreed to provide that cost estimate. There may or may not have been discussion at that point about the load limits for the bridge. Moore believes that he told Bird even in that initial conversation that he wanted emergency equipment to be able to use the bridge. It is not clear whether those discussions took place before or after the initial cost estimate had been prepared, but that does not need to be determined to decide the issues before the court. There were discussions about another means of driving to and from the home site via a low-water entry point, which would be inaccessible in periods of heavy rain or high water.

On May 21, 1993, Bird faxed a "rough cost" estimate to Moore, quoting a $2,000 engineering fee for bridge design, flood plain

computations, and to submit for approval of the plans. Total cost of the bridge, with a $3,000 contingency, was estimated to be $25,000.

After receiving the cost estimate, Moore proceeded to purchase the property. From his viewpoint, the cost estimate gave him sufficient assurance that the cost of the bridge would be reasonable and within his intended budget.

After purchasing the property, Moore asked Bird to proceed with design work and permit requests. By this time, the parties discussed the types of vehicles that should be able to use the bridge. Moore specifically noted that emergency equipment, including small fire trucks, should be able to use the bridge. Bird agreed to proceed with the design of a bridge to suit Moore's intended purposes.

On July 2, 1993, Bird transmitted an application for a permit to construct the bridge over Wolf Creek to the Johnson County Planning Office and, either directly or through the Johnson County Planning Office, to various state agencies with relevant regulatory authority.

Bird completed engineering drawings for the bridge on about September 9, 1993. The plans were submitted to Moore soon thereafter.

On September 24, 1993, Moore wrote the following notes in his spiral-bound Day-Timer planning calendar: "Bruce Bird[.] Bridge Max Design Load 16 Tons[.] Fire dept. 592-3926[.] Tanker -largest trucks. Largest tanker 1630 gal. Gross Wt. Loaded 31,000 lb. Routinely cross 8 + 10 ton bridges." The district court concluded that this entry was, in fact, made by Moore on September 24, 1993, as shown. It was not "manufactured evidence" created by Moore after the dispute between the parties arose.

Moore proceeded to hire a contractor to do the construction work in accordance with the Bird Engineering plans. As the project went along, there was consultation with Bird on a number of aspects of the work. Bird set stakes to show the site for the bridge abutments. He also examined some of the soils to determine their suitability and gave advice on some other aspects of the work.

Bird's plans did not call for "hooking" vertical steel rods into the pads of the bridge abutments. Nor did his plans specify the depth to which these vertical rods were to be embedded into the pads even without hooks. Bird was consulted about this during the construction phase. He said that hooking was not required and advised drilling some holes and anchoring the steel into the pads with epoxy. That was done as instructed. However, the method used was insufficient, either because hooking should have been done or because the steel rods were not sufficiently embedded into the pads. In either event, Bird's plans did not specify an appropriate method of solving this issue so that the structural integrity of the abutments would meet the necessary design loads.

Another engineer from Bird Engineering, Julie Davis, observed pouring of the concrete on the south bridge abutment. Moore had hired Bird Engineering to do some supervision work on the project. Bird Engineering had the opportunity to observe the key features of the installation and use of the vertical steel rods, as well as other work related to problems ultimately found in this project.

No one from Bird Engineering advised Moore of any significant problems associated with the construction of the bridge abutments or of any material deviation made by the contractors from the plans provided by Bird Engineering.

In late November 1993, the abutments had been constructed. Moore hired Robert Smith, a contractor who had worked with Moore previously, to backfill dirt around the abutments. Moore was on site while this work began but was about 1,000 feet away. Shortly after starting the work, Smith reported to Moore that the south abutment had begun to crack. In addition, it was also discovered that the abutment had moved a few inches.

Bird Engineering contends that Smith probably hit the abutment or in some other manner developed uneven loading against it. The district court concluded that Smith did not hit the abutment. Smith's method of backfilling the abutments was reasonable in this situation. The abutment cracked because of inadequate design, inadequate design detail, and inadequate embedding of the vertical steel rods. The abutment moved for the same reasons. As

Shafer, Kline's Gary Strack noted at trial, bridge abutments are not designed to move several inches.

Bird was consulted after this crack was noticed. He indicated to Moore that it should not be a problem and said to continue the backfill around it. Bird suggested some caulking or sealant should be placed into the crack.

Moore decided at this point to postpone further construction until after the winter. Moore did not plan to move into the house to be built there until August 1994.

On January 10, 1994, Bird Engineering forwarded an invoice to Moore for $725 for "inspection" services. The bill was for 6 hours at $45 per hour and 7 hours at $65 per hour. The time at $45 per hour presumably reflected the work of Davis; the remainder was presumably for work by Bird.

Moore paid the invoice for inspection services. He also paid Bird Engineering $2,000 for the engineering services in design of the bridge.

Later, Bird apparently concluded that the cracks in the abutment needed repair. On March 14, 1994, Bird sent a letter to Moore. He said, in part: "I looked at the bridge again, and think a slab should be added. It will repair the cracks and retain the abutment if needed. I recommend doing both ends." Accompanying the letter was a one-page drawing.

After receiving Bird's March 14 submittal, Moore decided that he wanted to consult with another engineering firm about the project. He employed Shafer, Kline to review the work done to date and what needed to be done to complete the bridge project.

On April 26, 1994, two engineers at Shafer, Kline, Michael Williams and Gary Strack, sent a letter to Moore criticizing the initial bridge design and the fix suggested by Bird in his March 14 letter. The Williams/Strack letter said, in part: "It is our opinion that if the bridge is constructed as shown on the [Bird Engineering] bridge plans, it will not perform satisfactorily and, in fact, may eventually become unserviceable. . . . We do not recommend installing the approach slab as indicated on a drawing enclosed with Bird Engineering's letter to you on March 14. This fix, as shown, does not appear to adequately address the problem." Williams and

Strack also said that "[a]t a minimum, the bridge should be capable of supporting trucks built on straight frames, *i.e.*, rural fire truck, dump truck, delivery truck."

Moore told Bird of the Shafer, Kline criticisms of Bird's work and also arranged a joint meeting among Moore, Bird, and Shafer, Kline.

Moore subsequently proceeded to hire Shafer, Kline to prepare plans for modifications and improvements to the bridge, which they completed in the summer of 1994.

Each of these primary actors has a recollection of a series of events that differs significantly from the others in terms of time sequences, what events caused which other events, which conversations occurred at which times, etc. The district court concluded one of them must be significantly in error on some of the basic facts.

The district court reiterated its conclusion that Moore actually did make the Day-Timer entry shown on September 24, 1993, on that date and that it accurately reflects his conversation with Bird. According to the district court, this piece of evidence, which was apparently not available to Bird when he "reconstructed" his recollection of the events, is completely inconsistent with Bird's version of events. It confirms that Bird told Moore that the bridge had been designed to accommodate at least the smaller sized fire trucks of the rural fire district. It also confirms that, after receiving the plans and hearing Bird's oral statement that the bridge was designed as requested to handle such loads, Moore double-checked with the fire district to learn the actual weight of its trucks.

Bird no doubt accurately recalls his initial conversation with Moore's ex-wife, the real estate agent for Moore's purchase of the property, that Moore would like to build the bridge in an economical way. No doubt Moore made similar statements and tried to save money wherever he could in the project. However, the court concludes that Moore did tell Bird that he wanted the bridge to be able to carry the load of the expected fire trucks of the fire district and that, based on his intention at the time to meet that agreed standard, Bird told Moore that it had a load capacity of 16 tons or 32,000 pounds.

Bird admits that the bridge, as he designed it, was not capable of carrying a load of 32,000 pounds. Bird testified at trial that he designed the bridge to carry loads up to 8,000 pounds. He said that he chose that weight limit based upon his knowledge that Moore drove a Chevy Suburban and that a similar vehicle Bird had owned a few years earlier had weighed 5,600 pounds. Bird said that he chose 8,000 pounds to account for such a vehicle carrying a heavy load, plus a small safety factor.

The district court found it hard to understand how Bird came to design the bridge in the manner he did, assuming the conversations with Moore took place as the court had concluded they did (and as documented in the Day-Timer). If Bird forgot the load weight that he had agreed to design the bridge for, his comments on September 24 could have been either a knowing misrepresentation or simply made in confusion. The district court concluded that it need not attempt to discern his motives in that conversation. Bird knew at the time of trial that his calculations were made for a designed load of 8,000 pounds. He certainly had reason to know that at the time of the September 24 conversation and at the time, earlier in September, when he delivered the plans to Moore.

Moore petitions this court to review the Court of Appeals' holding that intent to deceive is an essential element of K.S.A. 50-626(b)(1) of the KCPA. Bird's cross-petition for review questions the application of the KCPA to transactions for professional engineering services. If the Court of Appeals erred in assuming that the KCPA applies to engineering services, then we need not decide the issue raised by Moore's petition for review. Thus, we first consider whether the KCPA is applicable to engineering services.

Before we do that, it would be helpful to reiterate certain applicable rules of statutory construction. "Interpretation of a statute is a question of law in which appellate review is unlimited." *Kansas Dept. of SRS v. Paillet*, 270 Kan. 646, 16 P.3d 962 (2001).

"It is a fundamental rule of statutory construction, to which all other rules are subordinate, that the intent of the legislature governs if that intent can be ascertained. [Citation omitted.] The legislature is presumed to have expressed its intent through the language of the statutory scheme it enacted. When a statute is plain and unambiguous, the court must give effect to the intention of the legislature as

expressed, rather than determine what the law should or should not be. [Citation omitted.] Stated another way, when a statute is plain and unambiguous, the appellate courts will not speculate as to the legislative intent behind it and will not read such a statute so as to add something not readily found in the statute. [Citation omitted.]" *In re Marriage of Killman*, 264 Kan. 33, 42-43, 955 P.2d 1228 (1998).

The district court stated: "It cannot be seriously doubted that the plaintiff was a consumer and that the defendant was a supplier under the KCPA, even though no cases involving the provision of engineering services have reached the appellate courts." The Court of Appeals' majority opinion states: "It is not necessary to analyze the application of the KCPA to the engineering services giving rise to the action below. For the purposes of this opinion, we shall assume the applicability of the KCPA . . . ." Bird takes exception to that assumption and prays that we reverse that portion of the Court of Appeals' decision.

Although Moore recovered full damages against Bird Engineering for breach of contract, at issue here is Moore's claim under the KCPA which if granted provides an additional $5,000 civil penalty and reasonable attorney fees.

K.S.A. 50-623 calls for the KCPA to be construed liberally to streamline the law of consumer transactions and to protect consumers from unscrupulous suppliers. K.S.A. 50-624 defines terms used in the KCPA. " 'Consumer' means an individual or sole proprietor who seeks or acquires property or services for personal, family, household, business or agricultural purposes." K.S.A. 50-624(b). " 'Supplier' means a manufacturer, distributor, dealer, seller, lessor, assignor, or other person who, in the ordinary course of business, solicits, engages in or enforces consumer transactions, whether or not dealing directly with the consumer." K.S.A. 50-624(i). " 'Consumer transaction' means a sale, lease, assignment or other disposition for value of property or services within this state (except insurance contracts regulated under state law) to a consumer; or a solicitation by a supplier with respect to any of these dispositions." K.S.A. 50-624(c). The definition of services is very broad:

" 'Services' includes:

"(1) Work, labor and other personal services;

"(2) privileges with respect to transportation, hotel and restaurant accommodations, education, entertainment, recreation, physical culture, hospital accommodations, funerals and cemetery accommodations; and

"(3) any other act performed for a consumer by a supplier." K.S.A. 50-624(h).

In the present case, Moore is a consumer within the meaning of the statute in that he is an individual who sought services for personal purposes. Bird is a supplier within the meaning of the statute in that he is a person who, in the ordinary course of business, engages in consumer transactions. The consumer transaction in this case is Bird's sale of his engineering services to Moore. Those services consist of Bird's work in designing the bridge for Moore. The comfortable fit of the present parties and transaction within the statutory definitions confirms the district court's impression that the KCPA applies.

Bird Engineering argues that, notwithstanding the apparent fit within the definitions, this court never has applied the KCPA to professional services and should not start now. It contends that the KCPA was not intended to cover the odd transaction between individuals and the engineers for the reasons that "[f]ew consumers shop for engineering services, and engineers who provide such services are not in the business of mass-producing, advertising or selling such services."

Bird Engineering relies on *Vort v. Hollander*, 257 N. J. Super. 56, 607 A.2d 1339 (1992). Vort, an attorney, sued his clients for his fees; the clients counterclaimed, alleging malpractice and violation of the Consumer Fraud Act. It was dismissed on summary judgment, and the clients appealed. With regard to the consumer fraud claim, the appellate division stated:

"Defendants' contention that they have a right to establish their entitlement to damages under the Consumer Fraud Act, N.J.S.A. 56:8-1 to -48, is without merit. 'The purpose of the [Consumer Fraud] Act was to prevent deception, fraud or falsity, whether by acts of commission or omission, in connection with the sale and advertisement of merchandise and real estate.' *Fenwick v. Kay Am. Jeep, Inc.*, 72 N.J. 372, 376-77, 371 A.2d 13 (1977). Although the sale of certain services also falls within the purview of the Act, it is clear that attorney's services do not fall within the intendment of the Consumer Fraud Act.

"In *Neveroski v. Blair*, 141 N. J. Super. 365, 358 A.2d 473 (1976), this court concluded that real estate brokers were exempt from the Act, under the following reasoning:·

'A real estate broker is in a far different category from the purveyors of products or services or other activities. He is in a semi-professional status subject to testing, licensing, regulations and penalties through other legislative provisions. *Although not on the same plane as other professionals such as lawyers, physicians, dentists, accountants or engineers, the nature of his activity is recognized as something beyond the ordinary commercial seller of goods or services—an activity beyond the pale of the act under consideration.'* [*Id.* At 379, 358 A.2d 473 (citation omitted) (emphasis added)].

In 1975 the Legislature amended the Act to include deceptive practices in connection with the sale of real estate. L. 1975, c. 294, § 1, eff. Jan. 19, 1976. The Legislature, however, has not amended the Act to include professionals generally, despite our longstanding holding in *Neveroski*. Moreover, the practice of law in the State of New Jersey is in the first instance, if not exclusively, regulated by the New Jersey Supreme Court. N. J. Const. (1947), Art. VI, § II, par. 3; *In re Li Volsi*, 85 N.J. 576, 583, 428 A.2d 1268 (1981). Had the Legislature intended to enter the area of attorney regulation it surely would have stated with specificity that attorneys were covered under the Consumer Fraud Act." 257 N. J. Super. at 61-62.

The New Jersey court distinguished the legal profession on the basis that it is regulated exclusively by the state Supreme Court. 257 N. J. Super. at 62. Historically, attorneys were held to be ex-. empt from liability under the Sherman Antitrust Act. That exemption was known as the "learned profession" exemption. The learned profession originally included only lawyers, medical doctors, and clergy. See "The Learned Profession Exemption of the North Carolina Deceptive Trade Act: The Wrong Bright Line?" 15 Campbell L. Rev. 223, 250-51 (1993).

However, the application of the KCPA to the legal profession is not before us. The narrow issue before this court is whether the engineering services rendered in the present case are covered by the KCPA. We make no determination here as to application of the KCPA to other professional services.

Finally, this court's recent decision in *Alexander v. Certified Master Builders Corp.*, 268 Kan. 812, 1 P.3d 899 (2000), detracts still further from Bird's position. One of the questions certified to this court by the federal district court was whether Certified Master Builder Corporation (CMB), under the facts of the case, was a

supplier within the meaning of the KCPA. CMB is a trade organization created to promote the home building industry. For the following reasons, the court answered the certified question in the affirmative:

"CMB argues that it is merely a trade agency and should not be included in the definition of a supplier. It states that it merely informs or accommodates its members in a transaction. Further, CMB argues that including trade organizations in the definition would produce a chilling effect on such organizations and make them warrantors for the performance of their members.

"However, it is clear from the facts that CMB's role in the transactions was greater than it represents. The facts indicate that one of the purposes of CMB was to promote the home building industry. To that end, CMB encouraged its members to identify themselves as members and to use promotional material supplied to them by CMB. Further, CMB distributed a brochure to the general public which encouraged the public to contract with CMB members and provided a detailed list of the benefits of doing so. The brochure also represented that each of the members met a rigorous set of standards. CMB also advertised its program in newspapers. In this respect, CMB operated in the same manner as an advertising agency.

"Clearly, CMB, through its use of newspaper advertising and the distribution of its brochure, 'solicited' consumers to contract with its member builders. The building of a home is a consumer transaction. See K.S.A. 50-624(c) (defining a consumer transaction as a sale, lease, assignment or other disposition for value of property or services to a consumer or a solicitation by a supplier with respect to any of those dispositions). A party may be a supplier whether or not it deals directly with the consumer. Under the particular facts outlined, we conclude that CMB is a supplier under K.S.A. 50-624(i).

"CMB's argument that holding it to be a supplier will have a chilling effect on trade organizations and make it a guarantor of the performance of its members is not well taken. CMB is not a guarantor of the performance of its members. However, CMB is responsible for statements it makes in soliciting consumers to contract with its members. CMB did not warrant that its members would do flawless work. However, CMB did represent to consumers that certain benefits would be obtained as the result of contracting with a CMB member builder and that such builders had met certain standards for membership. Such representations fall within the ambit of the KCPA." 268 Kan. at 825-26.

We conclude that within the meaning of the KCPA, Moore is a consumer, Bird is a supplier, and the sale of Bird's services to Moore is a consumer transaction. Thus, the judgment of the district court and the assumption by the Court of Appeals is correct. Hav-

ing so held, we turn to the Court of Appeals' holding that intent to deceive is an essential element of K.S.A. 50-626(b)(1).

Moore based his claim under the KCPA on Bird's representing to him that the bridge he designed had the load capacity specified by Moore. The district court found that Moore specified a load capacity of 32,000 pounds but that Bird designed a bridge with a load capacity of 8,000 pounds. With regard to Moore's claim for breach of the KCPA, the district court concluded:

"K.S.A. 50-626 forbids 'deceptive acts and practices' in consumer transactions, which includes making representations 'knowingly or with reason to know that . . . services have . . . characteristics, . . . uses . . . [or] benefits . . . that they do not have,' K.S.A. 50-626(b)(1)(A), or that 'services are of a particular standard, quality, grade, style or model, if they are of another which differs materially from the representation.' K.S.A. 50-626(b)(1)(D). Here, defendant represented that the bridge had been designed to handle loads up to 32,000 pounds. *Defendant knew or had reason to know* at the time that representation was made that it was untrue. Accordingly, he engaged in a deceptive act or practice under the Kansas Consumer Protection Act." (Emphasis added.)

Thus, the district court's conclusion was phrased precisely as the statute is phrased. The district court further concluded:

"Bird Engineering engaged in a deceptive act or practice when Bird told Moore that the bridge had been designed to handle loads of 32,000 pounds, even though Bird Engineering knew or should have known that it had not been designed to withstand loads of that magnitude. The difference between a design to handle loads of 8,000 pounds, as claimed by Bird Engineering, and 32,000 pounds is a material difference."

The Court of Appeals majority had a different view of what constituted a deceptive act or practice. Citing *Gonzales v. Associates Financial Serv. Co. of Kansas*, 266 Kan. 141, 166, 967 P.2d 312 (1998), the Court of Appeals concluded that intent to deceive is a requirement of K.S.A. 50-626. With regard to the evidence, the Court of Appeals stated: "[T]here is no showing in the record that Bird Engineering misstated facts with the intention of deceiving Moore. In fact, Moore testified that Bird did not intentionally deceive him." Thus, the Court of Appeals held that Bird Engineering did not violate the KCPA.

Judge Knudson dissented "from that part of the majority's opinion reversing the district court's judgments under the KCPA." Judge Knudson reasoned:

"Under K.S.A. 50-626(b)(1), intent to deceive is not an element necessary to prove a deceptive act or practice. It is sufficient if Bird knew or should have known that the bridge was not designed to have a capacity of 32,000 pounds when he made that representation to Moore. The majority's reliance on *Gonzales* is misplaced; the *Gonzales* court was interpreting K.S.A. 50-626(b)(2) and (3), wherein proof of willfulness is specifically required."

Subsection (a) of K.S.A. 50-626 makes any deceptive act or practice in connection with a consumer transaction a violation of the KCPA. Subsection (b) of K.S.A. 50-626 is a list of illustrative deceptive acts and practices. Subsection (1) of subsection (b) provides in relevant part:

"(b) Deceptive acts and practices include, but are not limited to, the following, each of which is hereby declared to be a violation of this act, whether or not any consumer has in fact been misled:
(1) Representations made knowingly or with reason to know that:
(A) Property or services have sponsorship, approval, accessories, characteristics, ingredients, uses, benefits or quantities that they do not have;
. . . .
(D) property or services are of particular standard, quality, grade, style or model, if they are of another which differs materially from the representation."

In accordance with the statutory provisions under which Moore sought recovery, the district court found that Bird represented to Moore that the bridge design was what the consumer had requested when Bird knew or had reason to know that it was not. The phrase "knowingly or with reason to know" that fixes the intent requirement in subsection (1) of K.S.A. 50-626(b) differs from the language selected by the legislature for fixing the intent requirement in subsections(2) and (3) of K.S.A. 50-626(b), the subsections at issue in *Gonzales*. They provide:

"(b) Deceptive acts and practices include, but are not limited to, the following, each of which is hereby declared to be a violation of this act, whether or not any consumer has in fact been misled:
. . . .
(2) the willful use, in any oral or written representation, of exaggeration, falsehood, innuendo or ambiguity as to a material fact;

"(3) the willful failure to state a material fact, or the willful concealment, suppression or omission of a material fact."

*Gonzales* was a consumer loan case, which focused on K.S.A. 16a-2-401(9)(b) of the Kansas Uniform Consumer Credit Code (UCCC). The principal issue was whether, under the UCCC provision, the origination fee charged by the finance company could be based on the entire amount financed or whether it had to be based only on the amount of new money advanced when Gonzales refinanced loans. Resolution of the principal issue "influence[d] the resolution of other issues." 266 Kan. at 142. The court concluded that the UCCC authorized an origination fee based on the entire amount financed. 266 Kan. at 156-57. Among the secondary issues was the question of whether the finance company's conduct violated K.S.A. 50-626(b)(2) and (3). The finance company raised the defense that "it fully complied with [Truth in Lending Act] requirements and thus its behavior cannot be deceptive." 266 Kan. at 166. And, of course, the court already had concluded that the finance company's origination fee complied with the UCCC. Thus, the court found "no showing in the record that Associates either purposefully withheld relevant information or misstated facts with the intention of deceiving Gonzales." 266 Kan. at 166. In accordance with the statutory provisions under which Gonzales sought recovery, the court found that the finance company had not willfully used false information and had not willfully failed to provide material information.

When enacted in 1973, K.S.A. 50-626(b)(1) did not require representations to be made "knowingly or with reason to know." And K.S.A. 50-626(b)(2) and (3) required "intentional" use and "intentional" omission respectively. L. 1973, ch. 217, sec. 4. In 1976, the legislature amended K.S.A. 50-626(b) to add "knowingly or with reason to know" to subsection (1). L. 1976, ch. 236, sec. 3. In 1991, the legislature added the phrase "whether or not any consumer has in fact been misled" to the root provision of subsection (b). In addition, the legislature changed the word "intentional" in subsection(b)(2) to "willful" and changed one of the incidents of the word "intentional" in subsection (b)(3) to "willful." L. 1991, ch. 159, sec.

2. In 1993, the legislature changed the other incident of the word "intentional" in subsection (b)(3) to "willful." L. 1993, ch. 177, sec. 1. The change made to K.S.A. 50-626 in the 2000 legislative session did not affect any of the subsections involved in this discussion. L. 2000, ch. 167, sec. 1.

In *Gonzales,* the court cited *Porras v. Bell,* 18 Kan. App. 2d 569, 857 P.2d 676 (1993), and *Remco Enterprises, Inc. v. Houston,* 9 Kan. App. 2d 296, 677 P.2d 567, *rev. denied* 235 Kan. 1042 (1984). *Porras* involved alleged defects in a new house built by the defendants. Plaintiff sought recovery under the subsections under discussion here—K.S.A. 50-626(b)(1)(A) and (D), (b)(2), and (b)(3). The trial court had refused "to make intent an element of plaintiff's KCPA claim." 18 Kan. App. 2d at 570. Stating that "intent was required; mere nondisclosure was not sufficient," the Court of Appeals reversed and remanded for a new trial. 18 Kan. App. 2d at 570. The decision in *Porras* does not distinguish between the intent required for subsections (b)(1) on the one hand and (b)(2) and (3) on the other, but there was no need to under the circumstances.

The wording of the statutory provisions at issue in the present case differs from that of the statutory provisions at issue in *Gonzales.* The legislature is presumed to have expressed its intent through the language it chose for a statutory scheme. See *In re Marriage of Killman,* 264 Kan. 33, 42, 955 P.2d 1228 (1998). When a statutory scheme is plain, the court must give effect to the intention of the legislature as expressed. 264 Kan. at 42-43. In *Gonzales,* the court gave effect to the intention of the legislature as expressed in K.S.A. 50-626(b)(2) and (3). In the present case, the district court gave effect to the intention of the legislature as expressed in K.S.A. 50-626(b)(1). The pattern instructions reflect the differing intent requirements for these subsections. See PIK Civil 3d 129.02 through 129.04. Here, the district court correctly held that intent was not required.

The Court of Appeals is affirmed in part and reversed in part. The district court is affirmed.