No. 95,154

TRACY WILLIAMSON, *Appellant*, v. JACOB AMRANI, M.D.,
*Appellee*.

(152 P.3d 60)

Opinion filed February 9, 2007.

*Michael L. Hodges*, of Law Office of Michael L. Hodges, of Lenexa, argued
the cause and was on the briefs for appellant.

*Steven C. Day*, of Woodard, Hernandez, Roth & Day, L.L.C., of Wichita, ar-
gued the cause, and *Chris S. Cole* and *Nancy Ogle*, of the same firm, were with
him on the brief for appellee.

*Per Curiam*: This case raises the question of whether the Kansas
Consumer Protection Act (KCPA), K.S.A. 50-623 *et seq.*, applies
to a physician's professional conduct in providing treatment to a
patient, specifically whether a physician can be found to have en-
gaged in deceptive acts and practices in violation of K.S.A. 50-626
and unconscionable acts and practices in violation of K.S.A. 50-627
by knowingly making misrepresentations regarding the proposed
medical treatment or willfully concealing or failing to make disclo-
sures of material facts. We conclude the KCPA can apply to a
physician's conduct in providing treatment. We further conclude
that expert testimony may be necessary to prove the claim.

This case arose after Tracy Williamson sought treatment from
Jacob Amrani, M.D., for a disabling back injury Williamson had

sustained 14 years earlier. Dr. Amrani recommended that Williamson undergo lower back surgery for an L4-5 and L5-S1 fusion involving BAK cages (a surgical device) and an iliac crest bone graft. Dr. Amrani performed this surgery on Williamson in May 1999. When Dr. Amrani saw Williamson again in August 1999, she was still experiencing pain in her lower back and left leg. Dr. Amrani recommended a second surgery involving removal of the BAK cage at L4-5. Dr. Amrani performed the second surgery in October 1999.

Williamson filed suit against Dr. Amrani. In an amended petition, Williamson alleged that Dr. Amrani engaged in deceptive acts and practices in violation of K.S.A. 50-626 and unconscionable acts and practices in violation of K.S.A. 50-627 by making representations to Williamson that the surgery he would perform would have benefits that, in fact, it did not have. Specifically, Williamson alleged that Dr. Amrani represented that the surgery he was recommending had a high likelihood of successfully relieving her pain when, in fact, that surgery had been unsuccessful in the majority of cases where Dr. Amrani had utilized the same procedure. Williamson alleged that Dr. Amrani had willfully misrepresented or concealed material facts in that he knew or should have known that the surgery he was recommending had produced "bad results" for a majority of his patients.

At the time of her deposition Williamson testified that, prior to the first surgery, Dr. Amrani told her the surgery would relieve her pain to the point where she would no longer need pain medication and would be able to return to work.

Dr. Amrani filed a motion for summary judgment arguing that the KCPA does not apply to a physician's professional conduct in providing care and treatment to patients and that Williamson's KCPA claims were an impermissible attempt to creatively plead medical negligence (malpractice).

District Judge Timothy G. Lahey overruled Dr. Amrani's motion, finding that the KCPA applied. Noting that the KCPA must be liberally construed to bring consumer transactions within its scope, Judge Lahey found that, under the KCPA, the physician is a supplier and the patient is a consumer. Further, he found that

while the KCPA has some explicit exclusions, nothing in the KCPA excludes the physician-patient relationship from its scope. Judge Lahey found there was a genuine issue of material fact as to what Dr. Amrani told Williamson about the surgery; therefore, whether there was a violation of the KCPA was a question for the jury.

Dr. Amrani subsequently filed a second motion for partial summary judgment arguing that, even if the KCPA applied, Williamson would be required to produce expert testimony to establish her claim that Dr. Amrani should have informed her of his personal experience and success rate in performing the medical procedure at issue. Williamson had not identified any such expert witness.

Judge Lahey granted Dr. Amrani's motion, ruling that, while expert testimony would not be required to establish whether Dr. Amrani affirmatively misrepresented his level of experience or success rate in recommending the surgery to Williamson, expert testimony would be required to establish whether his failure to make an affirmative disclosure of his level of experience or success rate constituted a deceptive or unconscionable act or practice. Judge Lahey stated: "In the absence of expert testimony establishing a duty on the part of the doctor to disclose his experience to a patient, plaintiff does not establish a deceptive act."

Prior to the scheduled trial, Dr. Amrani filed several motions in limine to exclude certain evidence. At a hearing on those motions, a different judge, District Judge Warren M. Wilbert, informed the parties that he had recently ruled in another case that the KCPA does not apply to a physician's professional treatment of a patient, that he remained strongly of that view, and that he would likely rule that way at the time of a motion for directed verdict. In order to avoid the cost of trial and to conserve judicial resources, the parties agreed it would be more appropriate for the court to take up the matter on Dr. Amrani's request to reconsider his motion for summary judgment. Judge Wilbert then ruled that Dr. Amrani was entitled to judgment as a matter of law, making the following conclusions of law:

"1. The issues of what disclosures a surgeon should make to a patient regarding risks, benefits and the likelihood of success of the proposed surgery falls under an area of the law of medical malpractice known as informed consent. A claim

that a physician provided inadequate or inappropriate informed consent involves the professional aspect of a physician's practice as opposed to the proprietary, business aspects of the physician's practice;

"2. The Kansas Consumer Protection Act may under certain circumstances apply to the conduct of a physician in dealing with a patient. Application of the act, however, is limited to the proprietary and business aspects of a physician's practice and does not apply to the physician's professional conduct in providing treatment to a patient;

"3. The issue of whether, under the particular circumstances of this case, Dr. Jacob Amrani, as an orthopedic surgeon, should have provided a less optimistic appraisal of the likelihood of the surgery providing pain relief and other benefits is a subject intrinsically associated with professional judgment and the standard of care of such nature as to, first, necessitate expert testimony and, second, be of a type the Kansas Legislature did not intend to have adjudicated under the terms of the Kansas Consumer Protection Act."

Williamson timely appealed the district court's ruling granting summary judgment in favor of Dr. Amrani.

## APPLICATION OF THE KCPA

First, Williamson essentially contends the district court's summary judgment ruling in favor of Dr. Amrani was inappropriate in light of the KCPA's application to a physician's professional conduct in providing treatment to a patient.

### Standard of Review

This court's standard of review on summary judgment is well established:

" 'Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. The trial court is required to resolve all facts and inferences which may reasonably be drawn from the evidence in favor of the party against whom the ruling is sought. When opposing a motion for summary judgment, an adverse party must come forward with evidence to establish a dispute as to a material fact. In order to preclude summary judgment, the facts subject to dispute must be material to the conclusive issues in the case. On appeal, we apply the same rules and where we find reasonable minds could differ as to the conclusions drawn from the evidence, summary judgment must be denied. [Citation omitted.]' *Bracken v. Dixon Industries, Inc.*, 272 Kan. 1272, 1274-75, 38 P.3d 679 (2002)." *Garrett v. Read*, 278 Kan. 662, 667, 102 P.3d 436 (2004); see K.S.A. 60-256.

In this case, the district court decided that Dr. Amrani was entitled to judgment as a matter of law because the KCPA did not apply to a doctor's professional conduct in providing medical treatment to a patient. Resolution of this issue requires the court to interpret the KCPA. Statutory interpretation is a question of law subject to de novo review. *Myers v. Board of Jackson County Comm'rs*, 280 Kan. 869, 871, 127 P.3d 319 (2006).

"In resolving questions of statutory interpretation, this court follows a cardinal rule of statutory construction:

'It is a fundamental rule of statutory construction, to which all other rules are subordinate, that the intent of the legislature governs if that intent can be ascertained. The legislature is presumed to have expressed its intent through the language of the statutory scheme it enacted. When a statute is plain and unambiguous, the court must give effect to the intention of the legislature as expressed, rather than determine what the law should or should not be. Stated another way, when a statute is plain and unambiguous, the appellate courts will not speculate as to the legislative intent behind it and will not read such a statute so as to add something not readily found in it.' [Citations omitted.]" *State ex rel. Topeka Police Dept. v. $895.00 U.S. Currency*, 281 Kan. 819, 825, 133 P.3d 91 (2006).

## The Kansas Consumer Protection Act

Because the legislature is presumed to have expressed its intent through the language of the statutory scheme it enacted, the analysis must begin with a review of the relevant provisions of the KCPA.

K.S.A. 50-623 provides in relevant part that the KCPA "shall be construed liberally to promote the following policies: (a) To simplify, clarify and modernize the law governing consumer transactions; [and] (b) to protect consumers from suppliers who commit deceptive and unconscionable practices." K.S.A. 50-624 broadly defines the terms "consumer," "supplier," and "consumer transaction." A "[c]onsumer" is defined as "an individual . . . who seeks or acquires property or services for personal, family, household, business or agricultural purposes." K.S.A. 50-624(b). A "[s]upplier" is defined as "a manufacturer, distributor, dealer, seller, lessor, assignor, or other person who, in the ordinary course of business, solicits, engages in or enforces consumer transactions, whether or not dealing directly with the consumer." K.S.A. 50-624(j). The term "[c]onsumer transaction" means "a sale, lease,

assignment or other disposition for value of property or services within this state . . . to a consumer; or a solicitation by a supplier with respect to any of these dispositions." K.S.A. 50-624(c). The term "[s]ervices" includes "[w]ork, labor and other personal services" and "any other act performed for a consumer by a supplier." K.S.A. 50-624(i)(1), (3).

The plain language of the KCPA is broad enough to encompass the providing of medical care and treatment services within a physician-patient relationship. A physician is, in the ordinary course of business, a seller or supplier of services. See K.S.A. 50-624(j). A patient is a consumer of those services for personal, family, or business purposes. See K.S.A. 50-624(b). The sale of those services is a consumer transaction. See K.S.A. 50-624(c). Nothing in the KCPA explicitly excludes physicians or other professionals from the scope of its coverage. See, *e.g.*, *Moore v. Bird Engineering Co.*, 273 Kan. 2, 10-13, 41 P.3d 755 (2002) (KCPA applies to professional engineer who sells engineering services to consumer; engineer is a supplier and the sale of services is consumer transaction within scope of KCPA).

Furthermore, the KCPA does specifically exclude certain other persons and transactions from its scope. For example, insurance contracts regulated under state law are specifically excluded from the definition of consumer transactions. K.S.A. 50-624(c). The term "supplier" does not include "any bank, trust company or lending institution which is subject to state or federal regulation with regard to disposition of repossessed collateral by such bank, trust company or lending institution." K.S.A. 50-624(j). Also, the KCPA does not apply to "a publisher, broadcaster, printer or other person engaged in the dissemination of information or the reproduction of printed or pictorial matter so far as the information or matter has been disseminated or reproduced on behalf of others without actual knowledge that it violated the Kansas consumer protection act." K.S.A. 50-635. This shows that the legislature knows how to exclude certain categories of persons and transactions from the KCPA's coverage and could have done so with regard to physicians if it so intended.

Williamson cites various Kansas cases for the premise that professionals of all kinds are covered by the KCPA. See, *e.g.*, *Moore*, 273 Kan. at 10-13 (KCPA applies to professional engineer who sells engineering services to a consumer); *Hoffman v. Haug*, 242 Kan. 867, 752 P.2d 124 (1988) (sale of house to purchaser through real estate agent is consumer transaction covered by KCPA; purchaser fits definition of consumer and real estate agent fits definition of supplier).

However, not all of the cases cited by Williamson stand for the proposition she advances. For example, Williamson cites *Roy v. Young*, 278 Kan. 244, 93 P.3d 712 (2004), for the premise that attorneys are subject to the KCPA. In *Roy*, plaintiff sued his attorney and law firm alleging legal malpractice and violations of the KCPA. The district court granted defendant's motion for summary judgment on the ground that plaintiff's claims were time barred. On appeal, plaintiff argued that the district court erred in finding that his malpractice claim was time barred, but he made no argument with regard to the court's decision that his KCPA claim was time barred. Thus, this court concluded he had abandoned any issue as to the KCPA claim. 278 Kan. at 248. The issue of whether the KCPA applies to claims against attorneys was not decided by the court in *Roy*.

Williamson also cites *State ex rel. Stovall v. Martinez*, 27 Kan. App. 2d 9, 996 P.2d 371, *rev. denied* 269 Kan. 941 (2000), for the premise that insurance claims consultants are subject to the KCPA. In that case, the attorney general alleged that the defendant, an insurance claims consultant, was engaged in the unauthorized practice of law and that his representations to consumers regarding his qualifications violated the KCPA. It is questionable whether an insurance claims consultant who engages in the unauthorized practice of law can be considered a "professional"; thus, this case is of little value in determining whether the KCPA is applicable to professionals generally.

Additionally, Williamson contends that this court has applied the KCPA to physicians in three cases: *State ex rel. Stovall v. DVM Enterprises, Inc.*, 275 Kan. 243, 62 P.3d 653 (2003); *State ex rel.*

*Stovall v. Alivio,* 275 Kan. 169, 61 P.3d 687 (2003); and *State ex rel. Stovall v. ConfiMed.com,* 272 Kan. 1313, 38 P.3d 707 (2002).

All three of these cases involved actions brought by the attorney general under the KCPA against physicians and companies that sold prescription drugs over the Internet without a physical examination of the patient. In none of the cases did the defendants argue that the KCPA did not apply to the providing of care or treatment within a physician-patient relationship. In both *ConfiMed.com* and *DVM Enterprises,* the issue was whether the defendants' conduct was unconscionable under the KCPA; this court found it was not. *DVM Enterprises,* 275 Kan. at 251-52, 255; *ConfiMed.com,* 272 Kan. at 1322-24. In *Alivio,* the issues on appeal were related to the defendant doctor's attempt to set aside a default judgment. See 275 Kan. at 172. None of the three cases directly addressed the issue presented in this case.

Williamson's citation of *Moore,* 273 Kan. 2, is more germane. In *Moore,* the plaintiff hired the defendant, an engineer, to design a bridge to be built on the plaintiff's residential property. After the plaintiff sued, the district court found against the defendant for breach of contract, breach of express warranty, negligence, and violations of the KCPA. The Court of Appeals reversed the judgment as to the KCPA violations, finding that there was no intent to deceive on the part of the defendant. The plaintiff petitioned for review of the Court of Appeals' holding, and the defendant cross-petitioned for review, questioning the application of the KCPA to professional engineering services.

In analyzing whether the KCPA applied, this court first noted that "K.S.A. 50-623 calls for the KCPA to be construed liberally to streamline the law of consumer transactions and to protect consumers from unscrupulous suppliers." 273 Kan. at 10. The *Moore* court then cited the KCPA's definitions of "consumer," "supplier," "consumer transaction," and its "very broad" definition of "services." 273 Kan. at 10-11. The court found that the plaintiff was a consumer—an individual who sought services for personal purposes, and that the defendant was a supplier—a person who engaged in consumer transactions in the ordinary course of business. 273 Kan. at 11. The defendant's sale of engineering services, *i.e.,*

the work in designing the bridge for the plaintiff, constituted a consumer transaction. This court noted the "comfortable fit" between the facts of the case and the statutory definitions of the KCPA. 273 Kan. at 11.

The defendant argued that, notwithstanding the apparent comfortable fit of the facts within the statutory framework of the KCPA, the KCPA was not intended to cover professional services. In support, the defendant cited *Vort v. Hollander*, 257 N.J. Super. 56, 607 A.2d 1339 (1992), a New Jersey case which held that state's Consumer Fraud Act was not intended to apply to an attorney's professional services.

The *Moore* court distinguished *Vort*, stating:

"The New Jersey court distinguished the legal profession on the basis that it is regulated exclusively by the state Supreme Court. 257 N.J. Super. at 62. Historically, attorneys were held to be exempt from liability under the Sherman Antitrust Act. That exemption was known as the 'learned profession' exemption. The learned profession[s] originally included only lawyers, medical doctors, and clergy. See *The Learned Profession Exemption of the North Carolina Deceptive Trade Act: The Wrong Bright Line?* 15 Campbell L. Rev. 223, 250-51 (1993).

"However, the application of the KCPA to the legal profession is not before us. The narrow issue before this court is whether the engineering services rendered in the present case are covered by the KCPA. *We make no determination here as to application of the KCPA to other professional services.*" (Emphasis added.) 273 Kan. at 12.

Dr. Amrani offers several arguments as to why the KCPA would apply to engineers but should not be applied to physicians. These arguments include: cases from other jurisdictions in which it is concluded that those states' consumer protection statutes do not apply to actions against physicians when medical treatment is the gravamen of the suit; prior cases in this jurisdiction rejecting contract or fraud as the theoretical bases for professional liability suits; and the legislature's intent to create an alternative statutory scheme for medical malpractice suits. We will discuss each of these arguments

*Application of Consumer Protection or Deceptive Trade Practice Laws to Professional Services in Other Jurisdictions*

While *Moore* only briefly mentioned the traditional learned profession exemption and found it irrelevant to the facts of that case,

the exemption is of much more importance in the instant case, where the medical profession squarely falls into the category of learned professions. Although, as the *Moore* court recognized, there was historically a learned profession exemption from liability under the federal antitrust laws, that exemption was eroded by *Goldfarb v. Virginia State Bar*, 421 U.S. 773, 44 L. Ed. 2d 572, 95 S. Ct. 2004, *reh. denied* 423 U.S. 886 (1975). In *Goldfarb*, the United States Supreme Court recognized that the Sherman Antitrust Act contained no express exception for professionals. The *Goldfarb* Court held that the practice of law, as an "exchange of . . . service[s] for money," is "commerce" and falls within the scope of the Sherman Antitrust Act. 421 U.S. at 787-88. It also falls within the Federal Trade Commission (FTC) Act; see Flynn, *Physician Business (Mal)practice*, 20 Hamline L. Rev. 333, 339 (1996).

After *Goldfarb*, some states specifically exempted members of learned professions from the coverage under their consumer protection or deceptive trade practices acts (CPA or DTPA). See, *e.g.*, Md. Comm. Law Code Ann. § 13-104 (2005) (Maryland); N.C. Gen. Stat. § 75-1.1(b) (2005) (North Carolina); Ohio Rev. Code Ann. § 1345.01(A) (Lexis 2006) (Ohio). At least one state specifically exempted "trade or commerce otherwise permitted under laws administered by any regulatory board or offices acting under statutory authority of this state of the United States." N.H. Rev. Stat. Ann. § 358-A:3(I) (1995 & 2006 Supp.) (New Hampshire). This provision has been interpreted as exempting attorneys who are governed by their own self-regulating board. *Rousseau v. Eshleman*, 128 N.H. 564, 567, 519 A.2d 243 (1986), *reh. denied* 129 N.H. 306, 529 A.2d 862 (1987). Kansas has not specifically exempted professionals from the application of the KCPA in this manner.

Most states, like Kansas, have left it to the courts to determine whether attorneys, physicians, and other learned professionals fall within the coverage of their consumer protection or deceptive trade practice acts. See Flynn, 20 Hamline L. Rev. at 339. Kansas courts have not been squarely faced with the issue of whether the KCPA covers a physician's professional conduct in providing medical care or treatment to a patient. However, the issue has been

widely litigated in other jurisdictions with varying results. Many courts have interpreted the applicable statutory language as exempting professional conduct within the actual practice of law or medicine but not the entrepreneurial or business aspects of those practices. The district court in this case used the same approach.

One of the leading cases to make this distinction was *Quimby v. Fine*, 45 Wash. App. 175, 724 P.2d 403 (1986). In *Quimby*, the plaintiff filed a wrongful birth suit against a doctor who had substituted procedures during a tubal ligation surgery without the plaintiff's informed consent. The plaintiff brought an action for negligence and unfair and deceptive trade practices under the Washington CPA against the doctor based on theories of liability, negligence, and lack of informed consent.

The defendant doctor argued that the Washington CPA did not apply to either claim. The *Quimby* court cited *Short v. Demopolis*, 103 Wash. 2d 52, 61, 691 P.2d 163 (1984), a case which held that "certain entrepreneurial aspects of the practice of law may fall within the 'trade or commerce' definition" of the Washington CPA. *Quimby* extended the holding of *Short* and concluded that plaintiff's negligence claim did not fall within the scope of the Washington CPA "because it relates to the actual competence of the medical practitioner." 45 Wash. App. at 180. However, the *Quimby* court held that the plaintiff's lack of informed consent claim could fall within the scope of the Washington CPA "if it relates to the entrepreneurial aspects of the medical practice." 45 Wash. App. at 181. The court noted that a claim for lack of informed consent was not limited to a breach of the professional standard of care but "can be based on dishonest and unfair practices used to promote the entrepreneurial aspects of a doctor's practice, such as when a doctor promotes an operation or service to increase profits and the volume of patients, then fails to adequately advise the patient of risks or alternative procedures." 45 Wash. App. at 181.

Williamson cites several other cases which, like *Quimby*, have held that consumer protection laws can apply to misrepresentations made in professional practice. See *Karlin v. IVF America, Inc.*, 93 N.Y.2d 282, 690 N.Y.S.2d 495, 712 N.E.2d 662 (1999) (patients of in vitro fertilization program who alleged that program had dissem-

inated false success rates for program and misrepresented health risks presented could maintain action against program for deceptive practices and false advertising in violation of general business law and were not limited to medical malpractice claim based on lack of informed consent or barred from also asserting such a claim); *Rhodes v. Sorokolit*, 846 S.W.2d 618, 620-21 (Tex. Ct. App. 1993), *aff'd Sorokolit v. Rhodes*, 889 S.W.2d 239 (Tex. 1994) (Texas DTPA cause of action existed against plastic surgeon for misrepresentation and breach of express warranty where plastic surgeon promised patient's breasts would look just like those in *Playboy* picture and affirmatively stated there would be no problems with scarring or capsulization of implants); *Chapman v. Paul R. Wilson, Jr., D.D.S.*, 826 S.W.2d 214, 218-220 (Tex. Civ. App. 1992) (Texas Medical Liability Act provision which exempts medical negligence from coverage under Texas DTPA did not also extend protection for physician's misrepresentations as to services to be provided; where defendant allegedly misrepresented expertise in wisdom teeth extraction and stated that general anesthesia would be used, plaintiff could bring DTPA claim); *Eriks v. Denver*, 118 Wash. 2d 451, 463-65, 824 P.2d 1207 (1992) (entrepreneurial aspects of practice of law fall within Washington CPA and are involved if purpose of concealing information was to gain clients or increase profits).

Dr. Amrani responds that all of the cases relied upon by Williamson hold that only the entrepreneurial activities of a physician fall under consumer protection laws. Dr. Amrani cites a litany of cases which distinguish between negligence claims and claims involving the entrepreneurial or business aspects of the practice of medicine. While many of the cases set out persuasive policy reasons for exempting purely professional medical treatment from consumer protection laws, there is one significant problem with relying on these cases in Kansas. In making the distinction between professional conduct in the actual practice of medicine and the entrepreneurial or business aspects of the medical profession, the cases generally rely on statutory language stating that the consumer protection or deceptive trade practices act in question applies to those engaging in "trade or commerce." Most of the cases cited by Dr.

Amrani fall into this category. See *Haynes v. Yale-New Haven Hospital*, 243 Conn. 17, 32-38, 699 A.2d 964 (1997) (Connecticut Uniform Trade Practices Act [CUTPA] applies to "conduct of any trade or commerce"; touchstone for legally sufficient CUTPA claim against health care provider is allegation that entrepreneurial or business aspect of provision of services is implicated, aside from medical competence or malpractice; to hold otherwise "would transform every claim for medical malpractice into a CUTPA claim"); *Evanston Hosp. v. Crane*, 254 Ill. App. 3d 435, 443-44, 627 N.E.2d 29 (1993) (Illinois Consumer Fraud Act applies to "conduct of any trade or commerce"; Consumer Fraud Act not available as additional remedy to redress patient's damages arising from alleged medical malpractice where patient alleged hospital's patient guide was deceptive in stating that hospital was committed to high-quality care when patient did not receive such care); *Nelson v. Ho*, 222 Mich. App. 74, 84, 564 N.W.2d 482 (1997) ("Only when physicians are engaging in the entrepreneurial, commercial, or business aspect of the practice of medicine are they engaged in 'trade or commerce' within the purview of the [Michigan CPA].").

The "trade or commerce" language contained in many states' consumer protection laws appears to be the source of the entrepreneurial test. However, the KCPA does not contain any similarly restrictive "trade or commerce" language.

In enacting the KCPA, Kansas was one of three states that substantially adopted the Uniform Consumer Sales Practices Act (UCSPA). Ohio and Utah also substantially adopted the UCSPA. Texas adopted an act which has some similar provisions. See 7A (Pt. 1) U.L.A. (UCSPA), pp. 69-70 (2002).

Because Ohio also uses the language of the UCSPA, Kansas has previously looked to Ohio law for guidance in interpreting the KCPA. See *State ex rel. Miller v. Midwest Service Bur. of Topeka, Inc.*, 229 Kan. 322, 324, 623 P.2d 1343 (1981) (independent debt collection agency can be subject to provisions of KCPA under certain circumstances). In this instance, Ohio law is not helpful because Ohio has specifically excluded transactions between physicians and their patients from the definition of "consumer transaction." Ohio Rev. Code Ann. § 1345.01(A).

It does not appear that Utah courts have yet been faced with the question of whether Utah's CPA applies to the providing of care and treatment within a physician-patient relationship. In Texas, the legislature has made the courts' job easier by specifically exempting medical negligence claims from the coverage of its DTPA. See *Chapman*, 826 S.W.2d at 218.

The Kansas Legislature did not enact such an exemption. Rather, the statute applies broadly to services provided by a supplier of services to a consumer. This language is plain and unambiguous. Hence, we must give effect to the intention of the legislature as expressed. We see merit to many if not most of the policy arguments discussed in the cases from other jurisdictions. However, it is not our role to determine public policies; that is the role of the legislature. We must interpret the statute as it is plainly worded and, thus, do not find the authorities from other jurisdictions persuasive.

### Common-Law Causes of Action in Kansas

Next, Dr. Amrani argues that Williamson is attempting to creatively plead what is really a claim for medical malpractice. Dr. Amrani cites a series of Kansas cases holding that a plaintiff cannot bring a claim for breach of contract or fraud where the gravamen of the claim is medical malpractice. See *Malone v. University of Kansas Medical Center*, 220 Kan. 371, 374-76, 552 P.2d 885 (1976) (action for failure of medical center to furnish all needed treatment sounded in tort; action could not be characterized as one in contract in order to avoid bar of governmental immunity); *Travis v. Bishoff*, 143 Kan. 283, 284-85, 54 P.2d 955 (1936) (action against surgeon for failure to perform operation according to proper surgical practice was one for malpractice even though petition stated action was for breach of contract). *Cf. Noel v. Proud*, 189 Kan. 6, Syl. ¶ 1, 367 P.2d 61 (1961) (3-year statute of limitations on oral contracts, rather than 2-year statute for torts, applied to patient's action against physician for alleged breach of warranty that surgery would not worsen patient's condition).

In *Bonin v. Vannaman*, 261 Kan. 199, 929 P.2d 754 (1996), this court held that where a plaintiff alleged her physician failed to

disclose information on a chest x-ray and failed to diagnose her condition, the cause of action sounded in medical malpractice and not fraud even though the alleged conduct technically fulfilled all the elements of a claim for fraud by silence. Thus, the doctrine of fraudulent concealment could not be applied to extend the statute of limitations. The court stated:

> "This does not mean that a doctor can never be liable for fraud or breach of contract. Instead, this simply means that a fraud or breach of contract cause of action can only be based upon a physician's misconduct if that misconduct is beyond a breach of the legal duty which every doctor has the obligation to uphold. [Citation omitted.]
>
> "As this court stated in *Noel*, 189 Kan. at 10 (quoting *Calabrese v. Bickley*, 208 Misc. 407, 408-09, 143 N.Y.S.2d 846 [1955], *aff'd as modified* 1 App. Div. 2d 874, 150 N.Y.S.2d 542 [1956]):
>
> ' "As malpractice covers every way in which a patient is injured through the dereliction of a doctor in his professional capacity, the approach, depending on the facts, can be through any of several familiar forms of action. But no matter what the approach, it remains an action for malpractice, not one for deceit, contract or anything else. *A well recognized ground for recovery is where a physician represents that he has the skill to perform a certain operation when in fact he does not. This form of action requires the same elements of proof that an action in fraud requires, yet it could not be successfully disputed that as between the two it is an action for malpractice.*" ' (Emphasis added.)" *Bonin*, 261 Kan. at 210-11.

As a counter to *Bonin*, Williamson cites *Robinson v. Shah*, 23 Kan. App. 2d 812, 936 P.2d 784 (1997), a case which held that a physician's concealment of underlying malpractice gave rise to a fraud claim separate from the malpractice claim.

Dr. Amrani argues that, as in *Bonin*, the alleged misconduct in this case was part of the doctor's legal duty of informed consent. Williamson responds that knowingly selling a patient a surgery that has a small chance of success, while promising that the surgery has a great chance of success, is more than a mere failure of informed consent—it is a deceptive act or practice under the KCPA.

*Bonin* and the other above cited cases provide little guidance because they all deal with common-law causes of action. None of the cases deal with a claim under the KCPA, wherein the legislature has provided for a specific statutory cause of action. Furthermore, many of the cases cited by Dr. Amrani are focused on identifying a particular cause of action for purposes of determining the

applicable statute of limitations. In the context of the KCPA, a different kind of reasoning has been applied. Our courts have recognized that a claim under the KCPA is an action upon a liability created by statute; therefore, the applicable statute of limitations is the 3-year period provided in K.S.A. 60-512(2); see *Haag v. Dry Basement, Inc.*, 11 Kan. App. 2d 649, Syl., 732 P.2d 392, *rev. denied* 241 Kan. 838 (1987); see also *Alexander v. Certified Master Builders Corp.*, 268 Kan. 812, 819-24, 1 P.3d 899 (2000) (clarifying that different statutes of limitation apply depending upon whether action under KCPA seeks damages or statutory penalty; where plaintiff sought both civil penalties and actual damages, action was subject to 3-year limitations period of 60-512[2], *i.e.*, action upon liability created by statute).

In *Haag*, the defendant argued that because the plaintiff's KCPA claim was one based on fraud, the 2-year statute of limitations contained in K.S.A. 60-513(a)(3) barred the plaintiff's claim. The Court of Appeals disagreed, noting that an action for common-law fraud is not the same as an action under the KCPA because under the KCPA intent to defraud need not be proven. The court held that "because a supplier's liability to a consumer is created by the provisions of the Kansas Consumer Protection Act, the 3-year statute of limitations for an action upon a liability created by statute, K.S.A. 60-512(2), applies to suits brought under the Act." 11 Kan. App. 2d at 650.

Although we are not concerned here with the applicable statute of limitations, *Haag* reinforces the point that actions under the KCPA are statutorily created causes of action. Nothing prohibits the legislature from creating a statutory remedy even in situations where a common-law remedy may be available. The plain language of the KCPA provides such a statutory remedy since a physician provides a service to a consumer.

### Statutory Scheme Covering Medical Malpractice Claims

Finally, Dr. Amrani argues that the legislature has set forth a comprehensive statutory scheme specifically for the litigation of medical malpractice cases, which makes it clear that the legislature did not intend for claims against physicians to be remedied under

the KCPA. Dr. Amrani lists a variety of reforms in medical malpractice and tort law that took place in Kansas during the 1970's and 1980's. These reforms are described in detail in *Samsel v. Wheeler Transport Services, Inc.*, 246 Kan. 336, 339-340, 789 P.2d 541 (1990), *overruled in part on other grounds Bair v. Peck*, 248 Kan. 824, 811 P.2d 1176 (1991), and include, among other things, establishment of the Health Care Stabilization Fund and medical malpractice screening panels, shortening of the statute of limitations on medical malpractice, changes to the collateral source rule, and damages caps.

Dr. Amrani cites *Chelsea Plaza Homes, Inc. v. Moore*, 226 Kan. 430, 434, 601 P.2d 1100 (1979), as support for the argument that the KCPA does not apply to an area of substantive law that is the subject of other specific legislation. In *Chelsea Plaza*, this court held that the Kansas Residential Landlord and Tenant Act (KRLTA), K.S.A. 58-2540, *et seq.*, is specific legislation, complete in itself, which takes precedence over the broad KCPA and controls all transactions within its purview; thus, the KCPA is inapplicable to arrangements that fall within the provisions of the KRLTA.

*Chelsea Plaza* has been distinguished in two federal cases: *Skeet v. Sears, Roebuck & Co.*, 760 F. Supp. 872, 876 (D. Kan. 1991) (KCPA claim not preempted by Kansas Optometric Act in case against Sears for dispensing contact lenses without proper prescription), and *Bailey v. Morgan Drive-Away, Inc.*, 647 F. Supp. 648, 655-56 (D. Kan. 1986) (KCPA claim not preempted by Kansas Corporation Commission's regulation of intrastate common carriers; court found "no inherent conflict" between laws).

Williamson accurately points out that there is no single act or all-encompassing statutory scheme concerning medical malpractice comparable to the KRLTA at issue in *Chelsea Plaza*. While the legislature has passed various pieces of legislation affecting various aspects of medical malpractice litigation, it has not passed any legislation which precludes coverage for medical negligence claims under the KCPA. *Cf. Chapman*, 826 S.W.2d at 218 (Texas' Medical Liability Act specifically precludes coverage for medical negligence claims under that state's DTPA).

Because the language of the KCPA is broad enough to encompass a claim regarding the providing of medical care or treatment services brought by a patient against a physician for a violation under the KCPA, the district court's order granting summary judgment in favor of defendant, Dr. Amrani, is reversed.

## EXPERT TESTIMONY

Williamson also takes issue with Judge Lahey's ruling that, while expert testimony would not be required to establish whether Dr. Amrani affirmatively misrepresented his level of experience or success rate in recommending the surgery to Williamson, expert testimony would be required to establish whether the failure to make an affirmative disclosure of his level of experience or success rate constituted a deceptive or unconscionable act or practice under the KCPA.

## *Standard of Review*

In general, the district court is vested with wide discretion in receiving opinion evidence under K.S.A. 60-456. *Nunez v. Wilson*, 211 Kan. 443, 445, 507 P.2d 329 (1973). Expert testimony is generally required in medical malpractice cases to establish the standard of care and to prove causation, except where the lack of reasonable care or the existence of proximate cause is apparent to the average layman from common knowledge or experience. *Hare v. Wendler*, 263 Kan. 434, 440, 949 P.2d 1141 (1997); *Collins v. Meeker*, 198 Kan. 390, 394, 424 P.2d 488 (1967). In an informed consent case, expert testimony is generally necessary to establish that a physician's disclosures to the patient "were insufficient to accord with disclosures made by reasonable medical practitioners under the same or like circumstances." *Charley v. Cameron*, 215 Kan. 750, 756, 528 P.2d 1205 (1974); see *Tatro v. Lueken*, 212 Kan. 606, Syl. ¶ 3, 512 P.2d 529 (1973).

According to Williamson, because this is not an informed consent case, there is no need for expert testimony to establish whether a physician has a duty to reveal his or her level of experience and success rate with a particular procedure. Rather, the relevant question is whether Dr. Amrani knew that the surgery he was recom-

mending was not likely to produce the beneficial results he was promising. In her reply brief, Williamson argues that, while a negligence action for failure of informed consent must focus on whether a doctor has met the applicable standard of care, *i.e.*, what information a reasonable doctor would disclose under similar circumstances, an action under the KCPA can focus on the material expectations of the consumer, *i.e.*, what information a reasonable patient would consider important.

Dr. Amrani focuses on whether Williamson should be allowed to introduce evidence of the doctor's past experience with the surgical procedure he performed in the absence of expert testimony. This, however, was not the precise issue ruled on by the district court. Judge Lahey stated: "In the absence of expert testimony establishing a duty on the part of the doctor to disclose his experience to a patient, plaintiff does not establish a deceptive act."

Although Williamson argues this is not a medical malpractice or informed consent case, the well-established test for determining whether expert testimony is required is whether the subject matter is too complex to fall within the common knowledge of the jury and is "beyond the capability of a lay person to decide." *Hare*, 263 Kan. at 445; see also *Teikin v. Reynolds*, 904 P.2d 1387 (Colo. App. 1995) (statute requiring certificate of review in negligence action against licensed professional indicating that plaintiff's counsel consulted with expert in area of alleged negligent conduct and concluded the claim did not lack substantial justification; expert testimony also required in claims against physicians and clinic under Colorado's CPA).

Whether expert testimony is required depends on what point the plaintiff is trying to prove. As the district court found, a layperson could understand and judge, without the aid of expert testimony, an allegation that Dr. Amrani actually misrepresented his level of experience and success rate with the surgery, thereby misleading Williamson into agreeing to the surgery. Conversely, Williamson's attempt to prove that Dr. Amrani *should have* affirmatively disclosed his level of experience and success rate with the surgery but failed to do so, raises the question of whether such

disclosures would normally be made by a reasonable physician under similar circumstances.

Under K.S.A. 50-626(b)(3) of the KCPA, an allegation of deception by failing to fully disclose material facts requires proof of the willful failure to state a material fact or the willful concealment, suppression, or omission of a material fact. Before one can willfully fail to disclose a fact, there must be an obligation to communicate the fact. In other words, there must be a duty to disclose the fact. Although addressing the duty element of common-law fraud and not addressing the KCPA, in *OMI Holdings, Inc. v. Howell,* 260 Kan. 305, 918 P.2d 1274 (1996), the court made a statement which is applicable to a determination of whether there was an intentional failure to disclose a material fact under the KCPA, stating that a party has a duty to disclose material facts if the party knows the other party is entering a transaction under a mistake as to the facts and the other " ' "because of the relationship between them, the customs in trade, or other objective circumstances, would reasonably expect disclosure of such facts." ' " 260 Kan. at 347 (quoting *Boegel v. Colorado Nat'l Bank of Denver,* 18 Kan. App. 2d 546, 550, 857 P.2d 1362, *rev. denied* 253 Kan. 856 [1993]). Such a requirement is consistent with the duty imposed upon physicians to make those disclosures that would be made by a reasonable medical practitioner under the same or like circumstances. Expert testimony is ordinarily necessary to establish the standard of what a reasonable medical practitioner would disclose. *Charley,* 215 Kan. at 756. Thus, in order to determine whether Dr. Amrani's alleged failure to make an affirmative disclosure of his level of experience or success rate for the recommended surgery constituted a deceptive or unconscionable act or practice, the district court correctly ruled that expert testimony would be helpful in determining whether the disclosure is one that would be made by a reasonable medical practitioner under the same or like circumstances.

Affirmed in part, reversed in part, and remanded with directions.

LUCKERT, J., not participating.

LOCKETT, J., Retired, assigned.

DAVIS, J., dissenting: I respectfully dissent. The majority of this court concludes that the Kansas Consumer Protection Act (KCPA), K.S.A. 50-623 *et seq.*, applies to actions brought by patients against their physicians. According to the majority, the broad language of the KCPA defining "consumers," "suppliers," and "consumer transactions" may be read to encompass the physician-patient relationship because the physician (supplier) provides the patient (consumer) with medical care or treatment services (consumer transaction). The majority reasons that because the legislature did not explicitly exclude physicians from the scope of the KCPA, the KCPA must be "liberally construed" to allow the patient's cause of action for deceptive (K.S.A. 50-626) or unconscionable (K.S.A. 50-627) acts or practices under the KCPA.

I respectfully disagree with the majority for a number of reasons. Most notably, the majority decision undervalues the importance of the Kansas regulatory and statutory scheme relating to health care professionals, as well as the broad policy statements by the legislature found throughout the Kansas statutes which distinguish the medical and health care professions from supplier-consumer transactions covered by the KCPA. In my opinion, the majority's narrow reading of Kansas law—limiting its consideration to the KCPA alone, without seriously considering the statutes which specifically cover the health care professions—leads to the unreasonable result of "forcing" medical care or treatment into an uncomfortable and unintended KCPA action, thereby undermining Kansas' public policy of providing acceptable health care for its citizens as expressed by our elected representatives.

*Standard of Review*

The majority correctly states this court reviews questions of statutory interpretation de novo and that " '[i]t is a fundamental rule of statutory construction, to which all other rules are subordinate,

that the intent of the legislature governs if that intent can be ascertained.' " *State ex rel. Topeka Police Dept. v. $895.00 U.S. Currency*, 281 Kan. 819, 825, 133 P.3d 91 (2006). Thus, "[w]hen a statute is plain and unambiguous, the court must give effect to the intention of the legislature expressed, rather than determine what the law should or should not be." 281 Kan. at 825. Under this standard, the majority concludes that the "plain language of the KCPA is broad enough to encompass the providing of medical care or treatment services within a physician-patient relationship," and therefore Williamson could bring a cause of action against Dr. Amrani for a violation of the KCPA. 283 Kan. at 232.

While the majority correctly states that legislative intent is the keystone for all statutory interpretation, in my opinion its decision fails to give credence to the prior opinions of this court which do not require the court, when interpreting one statute or act, to view the entire act with blinders as to other statutes that also deal with a subject. This court has explained that "[i]n construing statutes or acts and determining legislative intent, several provisions of an act *or acts*, in pari materia, must be construed together with a view of reconciling and bringing them into workable harmony if possible. [Citation omitted.]" (Emphasis added.) *State ex rel. Morrison v. Oshman Sporting Goods Co. Kansas*, 275 Kan. 763, 768, 69 P.3d 1087 (2003); *Petty v. City of El Dorado*, 270 Kan. 847, 852, 19 P.3d 167 (2001).

In *Chelsea Plaza Homes, Inc. v. Moore*, 226 Kan. 430, 601 P.2d 1100 (1979), for example, this court looked outside the KCPA to determine whether the legislature intended to include an action for a landlord's "wrongful" eviction of a tenant under Kansas' consumer protection laws. The court did not limit its consideration to the KCPA's provisions, but it also considered the scope of the Kansas Residential Landlord Tenant Act (KRLTA), K.S.A. 58-2540 *et seq.*, which provided a similar cause of action. See 226 Kan. at 431-32. Comparing these two acts, the *Chelsea Plaza* court explained:

"It is a cardinal rule of law that statutes complete in themselves, relating to a specific thing, take precedence over general statutes or over other statutes which deal only incidentally with the same question, or which might be construed to relate to it. *Where there is a conflict between a statute dealing generally with a*

*subject, and another dealing specifically with a certain phase of it, the specific legislation controls in a proper case.* [Citations omitted.]" (Emphasis added.) 226 Kan. at 432.

While the *Chelsea Plaza* court recognized that the language of the KCPA which defined "consumer," "supplier," and "consumer transaction" was "clearly broad enough to include all leases of real estate," this court nevertheless held that the KCPA did not extend to transactions otherwise covered by the KRLTA. 226 Kan. at 433-34. Thus, despite the "plain language" of the KCPA, which would otherwise encompass the type of KCPA action brought in *Chelsea Plaza*, we recognized that the legislature's treatment of landlord-tenant transactions in other statutory sections created an inherent ambiguity in the language of the KCPA. As discussed below, the same may be said in the case we now consider.

The majority seeks to distinguish *Chelsea Plaza* on the basis that there is "no single act or all-encompassing statutory scheme concerning medical malpractice which could be compared to the Kansas Residential Landlord and Tenant Act." 283 Kan. at 243. I believe that the majority opinion not only mischaracterizes the legislature's extensive treatment of the medical and health care professions, but it also fails to recognize that while *Chelsea Plaza* states that a "complete" act (like the KRLTA) is clear evidence of a legislative intent to exclude a particular cause of action under the KCPA, "[t]he underlying premise of this rule is that *the most specific statute is also the clearest expression of legislative intent.* [Citation omitted.] Thus, the *Chelsea Plaza* principle is a device for determining which of two state statutes the legislature intended to apply to a particular situation." (Emphasis added.) *State ex rel. Stephan v. Brotherhood Bank and Trust Co.*, 8 Kan. App. 2d 57, 63, 649 P.2d 419, *rev. denied* 232 Kan. 876 (1982).

I do not believe that we may turn a blind eye to the legislature's other enactments that deal specifically with medical malpractice and health care professionals, for " 'statutes are construed to avoid unreasonable results. There is a presumption that the legislature does not intend to enact useless or meaningless legislation.' [Citations omitted.]" *Pieren-Abbott v. Kansas Dept. of Revenue*, 279 Kan. 83, 89, 106 P.3d 492 (2005).

"In the construction of statutes and reconciliation of conflicts, the court must always ascertain the intention of the legislature, if it can be done, from the subject matter of the statutes, and *where there is a conflict, the entire context of the statutes and the consequences of their enactment may be taken into consideration.* [Citation omitted.]" (Emphasis added.) *State, ex rel., v. Throckmorton,* 169 Kan. 481, 486, 219 P.2d 413 (1950).

In my opinion, the resolution of the case we now consider does not stop with the narrow determination that the language of the KCPA is "broad enough" to encompass claims brought by a patient against his or her physician. Instead, the analysis must continue with a question of whether such an interpretation is *reasonable* in light of the legislature's extensive statutory enactments relating to regulation of the health care professions, to medical malpractice, and to mandatory insurance for health care providers for actions alleging medical malpractice. I would conclude that the majority's interpretation is *not* reasonable in light of the legislature's all-encompassing statutory scheme relating to health care professionals, including physicians, the practice of medicine within this state, and the adverse effect the majority's interpretation would likely have upon the public health and welfare of Kansas citizens.

*Kansas' Extensive Statutory Treatment of the Medical and Health Care Professions*

Resolution of the issue in this case necessarily begins with the interpretation of the provisions of the KCPA but, in my opinion, does not end there. Consideration of the issue must also include an analysis of the legislature's extensive treatment of the medical and health care professions found throughout Kansas' statutory scheme.

*KCPA*

The KCPA is contained in Chapter 50 of the Kansas statutes, which covers unfair trade and consumer protection. As the majority notes, the KCPA contains very generalized definitions of "consumer," "supplier," "consumer transaction," and "services." According to K.S.A. 50-624:

"(b) 'Consumer' means an individual, husband and wife, sole proprietor, or family partnership who seeks or acquires property or services for personal, family, household, business or agricultural purposes.

"(c) 'Consumer transaction' means a sale, lease, assignment or other disposition for value of property or services within this state (except insurance contracts regulated under state law) to a consumer; or a solicitation by a supplier with respect to any of these dispositions.

. . . .

"(i) 'Services' includes:
(1) Work, labor and other personal services;
(2) privileges with respect to transportation, hotel and restaurant accommodations, education, entertainment, recreation, physical culture, hospital accommodations, funerals and cemetery accommodations; and
(3) any other act performed for a consumer by a supplier.
"(j) 'Supplier' means a manufacturer, distributor, dealer, seller, lessor, assignor, or other person who, in the ordinary course of business, solicits, engages in or enforces consumer transactions, whether or not dealing directly with the consumer. Supplier does not include any bank, trust company or lending institution which is subject to state or federal regulation with regard to disposition of repossessed collateral by such bank, trust company or lending institution."

The legislature's policy behind the enactment of the KCPA is described in K.S.A. 50-623, which states that the KCPA "shall be construed liberally to promote" four policies:

"(a) To simplify, clarify and modernize the law governing consumer transactions;
"(b) to protect consumers from suppliers who commit deceptive and unconscionable practices;
"(c) to protect consumers from unbargained for warranty disclaimers; and
"(d) to provide consumers with a three-day cancellation period for door-to-door sales."

Citing the above language in *Chelsea Plaza*, this court explained that "[c]learly, the [Kansas] Consumer Protection Act covers a *very broad* area of transactions." (Emphasis added.) *Chelsea Plaza Homes*, 226 Kan. at 434.

*Public Health*

The legislature's statutory treatment of the medical and health care professions begins within Chapter 65 of the Kansas statutes, K.S.A. 65-101 *et seq.*, which specifically relates to public health. The legislature provides a number of statements throughout its statutory scheme regarding the importance of the state's regulation of health care. For example, K.S.A. 65-4914, dealing with health care and peer review of medical and health care professionals in

liability actions, explains that the touchstone of Kansas' regulatory treatment of health care is a balancing act based on "reasonableness":

"It is the declared public policy of the state of Kansas that the provision of health care is essential to the well-being of its citizens as is the achievement of an acceptable quality of health care. Such goals may be achieved by requiring a *system* which combines a reasonable means to monitor the quality of health care with the provision of a reasonable means to compensate patients for the risks related to receiving health care rendered by health care providers licensed by the state of Kansas." (Emphasis added.)

The Kansas Healing Arts Act (KHAA), K.S.A. 65-2801 *et seq.*, which specifically covers physicians, see K.S.A. 65-2869, establishes an extensive regulatory scheme which outlines the education, licensing, and professional and ethical standards imposed on members of the healing arts. The "healing arts" are defined by K.S.A. 65-2802(a) as

"any system, treatment, operation, diagnosis, prescription, or practice for the ascertainment, cure, relief, palliation, adjustment, or correction of any human disease, ailment, deformity, or injury, and includes specifically but not by way of limitation the practice of medicine and surgery; the practice of osteopathic medicine and surgery; and the practice of chiropractic."

K.S.A. 65-2801 describes the policy behind the enactment of the KHAA. The legislature explicitly stated:

"Recognizing that the practice of the healing arts is a privilege granted by legislative authority and is not a natural right of individuals, *it is deemed necessary as a matter of policy in the interests of public health, safety and welfare, to provide laws and provisions covering the granting of that privilege and its subsequent use, control and regulation to the end that the public shall be properly protected against unprofessional, improper, unauthorized and unqualified practice of the healing arts and from unprofessional conduct by persons licensed to practice under this act.*" (Emphasis added.)

To this end, the legislature established the State Board of Healing Arts for "the purpose of administering" the KHAA, K.S.A. 65-2812 through K.S.A. 65-2823, and outlined specific licensing, examination, and good standing requirements for continued practice of the healing arts professions in this state. See K.S.A. 65-2803 through K.S.A. 65-2811a (licensing); K.S.A. 65-2824 through K.S.A. 65-

2835 (examination and good standing); K.S.A. 65-2869 (persons deemed engaged in the practice of medicine and surgery).

In addition, K.S.A. 65-2836 sets forth the grounds for license suspension or revocation under the KHAA. Of interest here, the statute includes the following possible violations:

"(b) The licensee has committed an act of unprofessional or dishonorable conduct or professional incompetency.

. . . .

"(d) The licensee has used fraudulent or false advertisements.

. . . .

"(w) The licensee has an adverse judgment, award or settlement against the licensee resulting from a medical liability claim related to acts or conduct similar to acts or conduct which would constitute grounds for disciplinary action under this section." K.S.A. 65-2836.

The KHAA defines "unprofessional conduct" in K.S.A. 65-2837(b) as:

"(1) Solicitation of professional patronage through the use of fraudulent or false advertisements, or profiting by the acts of those representing themselves to be agents of the licensee.

"(2) Representing to a patient that a manifestly incurable disease, condition or injury can be permanently cured.

. . . .

"(8) Advertising to guarantee any professional service or to perform any operation painlessly.

. . . .

"(12) Conduct likely to deceive, defraud or harm the public.

"(13) Making a false or misleading statement regarding the licensee's skill or the efficacy or value of the drug, treatment or remedy prescribed by the licensee or at the licensee's direction in the treatment of any disease or other condition of the body or mind.

. . . .

"(18) Obtaining any fee by fraud, deceit or misrepresentation.

. . . .

"(24) Repeated failure to practice healing arts with that level of care, skill and treatment which is recognized by a reasonably prudent similar practitioner as being acceptable under similar conditions and circumstances."

"Advertisements" are defined in the KHAA as "all representations disseminated in any manner or by any means, for the purpose of inducing, or which are likely to induce, directly or indirectly, the purchase of professional services." K.S.A. 65-2837(d).

The legislature authorized the State Board of Healing Arts to take disciplinary action against physicians or other health care professionals who violate the requirements of the KHAA. K.S.A. 65-2838. The KHAA establishes a disciplinary counsel and committee to oversee the healing arts professions. K.S.A. 65-2840a. In the event of a potential violation, proceedings may be instituted against the violator by the attorney general, county attorney, or district attorney. K.S.A. 65-2866. If the Board determines that a violation has taken place, the violator shall be deemed guilty of a misdemeanor and may be required to pay both criminal fines (K.S.A. 65-2862) and civil fines (K.S.A. 65-2863a).

While the KHAA does not establish a private statutory cause of action for patients who have been injured, it nevertheless contemplates the existing landscape of medical malpractice. See, *e.g.*, K.S.A. 65-4901(establishing medical malpractice screening panels "[i]f a petition is filed in a district court of this state claiming damages for personal injury or death on account of alleged medical malpractice of a health care provider").

Evidence of the legislature's concern with the regulation of the healing arts is not limited to the KHAA, or even to Chapter 65. Article 34 of Chapter 40 of the Kansas statutes, K.S.A. 40-3401 *et seq.*, provides a comprehensive treatment of the professional liability of health care providers and the requirement of liability insurance for medical and health care professionals. Specifically, K.S.A. 40-3402(a) requires all health care professionals who wish to practice within the state to carry mandatory malpractice liability insurance. The legislature further established the health care stabilization fund in order to assure that individuals injured through a physician's or health care provider's professional malpractice will be compensated. See K.S.A. 2006 Supp. 40-3403(a). This fund is held in trust by the state and monitored by a state-appointed board of governors, which is subject to extensive review and regulation. See generally K.S.A. 2006 Supp. 40-3403. There is no indication within the statutes relating to the health care stabilization fund that its monies are intended to compensate actions brought by patients against their physicians or other health care professionals under the KCPA.

Further iteration of the legislature's concerns relating to the regulation of medical malpractice insurance is found in Article 34 of Chapter 60 of the Kansas statutes, K.S.A. 60-3404 *et seq.*, which deals exclusively with the issue of professional liability of health care providers. The policy statement contained in K.S.A. 60-3405 is explicit and discusses a number of weighty concerns:

"Substantial increases in costs of professional liability insurance for health care providers have created a *crisis of availability and affordability*. This situation poses a serious threat to the continued availability and quality of health care in Kansas. In the interest of the public health and welfare, *new measures are required to assure that affordable professional liability insurance will be available to Kansas health care providers, to assure that injured parties receive adequate compensation for their injuries, and to maintain the quality of health care in Kansas.*" (Emphasis added.)

In my opinion, adding another separate cause of action against health care providers under the KCPA exacerbates the crisis of availability and affordability of health care for Kansas citizens. There is no evidence in the record to establish that insurance for health care providers is available to cover additional actions under the KCPA. Moreover, litigation expenses covered by the mandatory professional liability insurance for health care providers would not cover actions under the KCPA. The majority decision that Dr. Amrani's providing of medical care and treatment is covered by the KCPA essentially establishes that all health care providers are covered by the KCPA with the result of increased litigation, increased costs of defending KCPA actions by health care providers, increased insurance expenses, and, ultimately, an increase in the costs of medical care. Ultimately, the majority decision regarding the KCPA conflicts with Kansas' extensive statutory scheme governing public health and the health care professions as well as the expressed public policy to maintain the quality of health care in Kansas.

The legislature's concern relating to the increased costs of medical malpractice actions and insurance also permeates the public health statutes in Chapter 65. See *Fieser v. Kansas Bd. of Healing Arts*, 281 Kan. 268, 274, 130 P.3d 555 (2006) (citing Minutes, House Judiciary Comm., Interim Comm. Report, January 21, 1986,

and noting that the legislature amended the KHAA in 1986 and that "[e]nhanced Board disciplinary power was sought, in the hope such peer review would decrease the number of medical malpractice lawsuits filed"). K.S.A. 60-3404 through K.S.A. 60-3414 were part of the 1986 "sweeping and comprehensive" medical malpractice act. See L. 1996, ch. 229 (H.B. 2661); Comment, *Caps, "Crisis," and Constitutionality-Evaluating the 1986 Kansas Medical Malpractice Legislation*, 35 U. Kan. L. Rev. 763, 764 (1987). This legislation included, among other provisions, an amendment allowing for the admissibility of screening panel review determinations at subsequent trials, K.S.A. 65-4904(c); the addition of an internal risk management program requirement for medical care facilities, K.S.A. 65-4922; damages caps on recovery in medical malpractice actions, K.S.A. 60-3411 (since repealed, L. 1989, ch. 143, sec. 10); and the requirements for expert witnesses in K.S.A. 60-3412. The broad-sweeping act was apparently "prompted by the fear that the escalating cost of medical liability insurance would drive health care providers out of certain areas of practice, or even out of the state." Comment, 35 U. Kan. L. Rev. at 776. The same may be said of adding a new, separate action under the KCPA against doctors or health care professionals in the fields of their practice.

Yet while these concerns expressed by the legislature are grave, the provisions of K.S.A. 60-3406 through K.S.A. 60-3408 adopted in the 1980s *"apply only to medical malpractice liability actions which are based on causes of action accruing on or after July 1, 1986."* (Emphasis added.) K.S.A. 60-3410. It is evident that the policy statement regarding insurance and continuing provisions for health care providers in Kansas did not contemplate actions against physicians or health care professionals for care and treatment services being brought under the KCPA, which was originally adopted in 1973. See L. 1973, ch. 217, secs. 1-21.

Not only does the legislature's explicit concern for the rising litigation and insurance costs relating to medical malpractice belie the majority's conclusion that the legislature intended the KCPA to cover new actions by a patient against a physician, but in my opinion it is unreasonable in light of the legislature's specific treatment of health care professionals' liability insurance. Article 35 of

Chapter 60 of the Kansas statutes, K.S.A. 60-3501 *et seq.*, which relates to "professional malpractice" for "professional licensees," among others, engineers, specifically excludes a discussion of health care professionals from other potential varieties of professional malpractice. K.S.A. 60-3501(a). Instead, the legislature has dealt separately and comprehensively with the issues of health care professionals' liability actions and insurance, indicating that it did not intend to group these issues together with its regulation of other professional misconduct. See K.S.A. 60-3404 *et seq.*; K.S.A. 40-3401 *et seq.*

Moreover, the legislature's designation of a specific statute of limitations for actions against health care providers regarding services rendered gives further credence to the fact that the legislature did not intend to include actions arising out of a physician's practice of medicine under the KCPA. As the majority correctly notes, Kansas courts have held that the proper statute of limitations for actions filed under the KCPA is 3 years, pursuant to K.S.A. 60-512(2) (an action created by statute). See *Haag v. Dry Basement, Inc.*, 11 Kan. App. 2d 649, 650, 732 P.2d 392, *rev. denied* 241 Kan. 838 (1987). The majority states that "actions under the KCPA are statutorily created causes of action" and that "[t]he plain language of the KCPA provides such a statutory remedy [in this case] since a physician provides a service to a consumer." *Williamson*, 283 Kan. at 242.

However, health care providers are covered by a different statute of limitations than that required for the KCPA under K.S.A. 60-512(2). K.S.A. 60-513(a)(7) specifically provides that its 2-year statute of limitations applies to "[a]n action arising out of the *rendering of or failure to render professional services by a health care provider*, not arising on contract." (Emphasis added.) K.S.A. 60-513d defines "health care provider" for purposes of the statute of limitations to include, among other medical professionals, "a person licensed to practice any branch of the healing arts." Kansas courts have generally categorized the injuries that fall under the umbrella of K.S.A. 60-513(a)(7) as actions for "medical malpractice." See *Martindale v. Tenny*, 250 Kan. 621, 634, 829 P.2d 561 (1992).

K.S.A. 60-513(a)(7) was adopted by the legislature in 1976, 3 years after the original enactment of the KCPA. Compare L. 1976,

ch. 254, sec. 1 with L. 1973, ch. 217, secs. 1-21. This chronology demonstrates that the Kansas Legislature did not consider actions that arise out of physicians' or other health care professionals' treatment services to patients as being within the reach of consumer protection, as defined by the KCPA. Instead, the legislature has specifically distinguished between actions involving medical care and treatment services for statutes of limitations purposes and other actions. To interpret the KCPA as covering physician-patient relationships arising out of a physician's provision of medical services, as the majority does here, is to ignore and nullify the plain language of K.S.A. 60-513(a)(7), which explicitly states that it applies to any action arising out of "professional services" rendered by "a health care provider."

The majority ultimately rejects Dr. Amrani's argument that the KCPA should not be interpreted as providing an additional cause of action for patients against their physicians in the rendering of medical care and treatment, and concludes that "[w]hile the legislature has passed various pieces of legislation affecting various aspects of medical malpractice litigation, it has not passed any legislation which precludes coverage for medical negligence claims under the KCPA." *Williamson*, 283 Kan. at 243.

I respectfully disagree with the majority's conclusion and believe that it is flawed for a number of reasons. First, the above discussion of the legislature's *extensive* statutory treatment of the medical and other health care professions, medical malpractice liability, and mandatory insurance for health care professionals, as well as its explicit statement in K.S.A. 65-4914 regarding the importance of balancing the public's interest in the availability of quality health care against the interest in private compensation for those injured, indicate that it would be *unreasonable* to read into the KCPA such a cause of action without specific language establishing such liability.

In addition, the majority's conclusion implies that the permeation of the legislature's stated policy throughout Kansas' extensive statutory scheme relating to public health actually *prevents* this court from finding such legislation is "complete" for purposes of statutory interpretations. *Cf. Chelsea Plaza Homes*, 226 Kan. at

432. To me, the majority's conclusion is counterintuitive. The legislative expression of the numerous explicit policy statements balancing the public and private interests throughout the statutory scheme relating to health care professionals indicates that the legislature found the balance extremely important. Moreover, despite its numerous policy statements relating to the health care system in Kansas, the legislature chose to remain silent regarding physicians and the KCPA. In my opinion, these reasons support a conclusion that the legislature did *not* intend for medical or health care treatment provided by a doctor or other health care professional to fall under the purview of this state's consumer protection laws.

Contrary to the majority's conclusion, I am of the opinion that the legislature did not intend for a physician to be liable to his or her patients under the KCPA for the rendering of care or treatment services associated with the practice of medicine. This conclusion I believe construes both the KCPA and other statutory acts involving the practices of medicine and health care in this state, in pari materia, reconciling and bringing them into a workable harmony. Additionally, this conclusion supports the well-recognized rule that when considering statutes or acts of general application, the KCPA, and a specific, comprehensive statutory scheme relating the practices of physicians or other health care professionals in Kansas *"the most specific statute[s or acts are] . . . the clearest expression of legislative intent." State ex rel. Stephan v. Brotherhood Bank and Trust Co.,* 8 Kan. App. 2d 57, 63, 649 P.2d 419, *rev. denied* 232 Kan. 876 (1982).

## Decisions of Other Jurisdictions

As the majority opinion recognizes, other jurisdictions which have been faced with this conflict between their consumer protection laws and the specific statutes regulating the medical and other health care professions have drawn a distinction between allegations involving the entrepreneurial aspects of the medical profession, which give rise to consumer protection claims, and allegations involving the actual practice of providing medical care or treatment by a health care professional, which are covered by those states'

regulation of the health care professions and medical malpractice law. For example, in *Evanston Hosp. v. Crane*, 254 Ill. App. 3d 435, 443-44, 627 N.E.2d 29 (1993), an Illinois appellate court rejected a cause of action under the Illinois Consumer Fraud Act which (like the claim made by Williamson in the case we now consider) involved allegations of misrepresentations by a physician to a patient regarding the quality of health care the physician would provide. The court explained:

"The misconduct alleged here . . . amounts to professional malpractice, and cannot be equated with the misdeeds of an ordinary commercial enterprise, against which the Consumer Fraud Act was expressly enacted to protect 'consumers' and 'businessmen.' [Citation omitted.] Although the practice of medicine may have a business aspect, the commercial phases of medicine which directly affect the public are not at issue here. The Consumer Fraud Act 'is intended to reach practices of the type which affect consumers generally and is not available as an additional remedy to redress a purely private wrong.' [Citation omitted.]" 254 Ill. App. 3d at 444.

The courts of Michigan, Connecticut, and Washington have come to similar conclusions with regard to the scope of the consumer protection acts of those states. See *Nelson v. Ho*, 222 Mich. App. 74, 83, 564 N.W.2d 482 (1997) (holding that "only allegations of unfair, unconscionable, or deceptive methods, acts, or practices in the conduct of the entrepreneurial, commercial, or business aspect of a physician's practice may be brought under the [Michigan] CPA"); *Haynes v. Yale-New Haven Hospital*, 243 Conn. 17, 34, 699 A.2d 964 (1997) (Court concluded that "professional negligence—that is, malpractice—does not fall under [Connecticut Unfair Trade Practices Act] CUTPA. Although physicians and other health care providers are subject to CUTPA, only the entrepreneurial or commercial aspects of the profession[s] are covered."); *Quimby v. Fine*, 45 Wash. App. 175, 180, 724 P.2d 403 (1986) (finding that claims relating "to the actual competence of the medical practitioner" are not actionable under the Washington Consumer Protection Act).

The majority seeks to dismiss the reasoning of these cases because the consumer protection statutes reviewed contained the phrase "trade or commerce" in their discussions of the scope of

their acts. See Conn. Gen. Stat. Ann. § 42-110b(a) (2000 & 2006 Supp.); Ill. Comp. Stat. ch. 815 505/2 (1999); Mich. Comp. Laws § 445.903(l) (2002 & 2006 Supp.); Wash. Rev. Code § 19.86.020 (1999 & 2007 Supp.). According to the majority, the fact that "the KCPA does not contain any similarly restrictive 'trade or commerce' language" renders those states' decisions unpersuasive. *Williamson*, 283 Kan. at 239.

However, the majority fails to look beyond those states' use of the phrase "trade or commerce" to the broad definition of this phrase within the states' respective consumer protection statutes. The use of "trade or commerce" is *not* "restrictive," but rather it is defined within those acts to encompass a broad array of transactions. The Connecticut Unfair Trade Practices Act defines " '[t]rade' and 'commerce' " as "the advertising, the sale or rent or lease, the offering for sale or rent or lease, or the distribution of any services and any property, tangible or intangible, real, personal or mixed, and any other article, commodity, or thing of value in this state." Conn. Gen. Stat. Ann. § 42-110a(4) (2006 Supp.). The Illinois Consumer Fraud Act contains a similarly broad definition, stating:

"The terms 'trade' and 'commerce' mean the advertising, offering for sale, sale, or distribution of any services and any property, tangible or intangible, real, personal or mixed, and any other article, commodity, or thing of value wherever situated, and shall include any trade or commerce directly or indirectly affecting the people of this State." Ill. Comp. Stat. ch. 815 505/1(f) (1999).

The Michigan Consumer Protection Act likewise defines " '[t]rade or commerce' " as

"the conduct of a business providing goods, property, or service primarily for personal, family, or household purposes and includes the advertising, solicitation, offering for sale or rent, sale, lease, or distribution of a service or property, tangible or intangible, real, personal, or mixed, or any other article, or a business opportunity." Mich. Comp. Laws § 445.902(d) (2002).

See also Wash. Rev. Code § 19.86.010(2) (1999 & 2007 Supp.) (" 'Trade' and 'commerce' shall include the sale of assets or services, and any commerce directly or indirectly affecting the people of the state of Washington.").

Contrary to the majority's conclusion that the "trade or commerce" language restricts the scope of those states' consumer protection acts, a consideration of those states' definitions of "trade or commerce" for consumer protection purposes illustrates their acts' far-reaching scope. See *Nelson*, 222 Mich. App. at 78 (explaining that the Michigan Consumer Protection Act "broadly defines 'trade or commerce' ").

Furthermore, the definitions of "trade or commerce" in Connecticut, Illinois, and Michigan do not differ greatly from the definition of a "consumer transaction" under the KCPA. See K.S.A. 50-624(c), which defines a " '[c]onsumer transaction' " as "a sale, lease, assignment or other disposition for value of property or services within this state (except insurance contracts regulated under state law) to a consumer; or a solicitation by a supplier with respect to any of these dispositions." Thus, while the KCPA does not use the exact phrase "trade and commerce," the actual scope of the KCPA is not any broader than the other states' acts discussed above.

I am of the opinion that the discussion found in those opinions regarding "trade or commerce" is relevant and enlightening with regard to other jurisdictions' interpretation of consumer protection statutes which, similar to Kansas, contain no explicit exception for physicians or other health care professionals. As the Michigan Court of Appeals persuasively explained in *Nelson*,

"[w]e do not consider the Legislature's use of 'trade or commerce' in defining the application of the act to exhibit an intent to include the actual performance of medical services or the actual practice of medicine. *If we were to interpret the act as such, the legislative enactments and well-developed body of law concerning medical malpractice could become obsolete. While we are aware of the expense and difficulty in maintaining a medical malpractice action, we do not think the MCPA was meant by the Legislature to be an alternative to its specific statutory scheme addressing medical malpractice claims.* Only when physicians are engaging in the entrepreneurial, commercial, or business aspect of the practice of medicine are they engaged in 'trade or commerce' within the purview of the MCPA." (Emphasis added.) *Nelson*, 222 Mich. App. at 83-84.

Similarly, the Connecticut Supreme Court held that "[m]edical malpractice claims recast as CUTPA claims cannot form the basis for a CUTPA violation. *To hold otherwise would transform every*

*claim for medical malpractice into a CUTPA claim.*" (Emphasis added.) *Haynes*, 243 Conn. at 38; see also *S & D Environmental v. Rosenberg*, 334 N.J. Super. 305, 318, 759 A.2d 360 (1999) (finding that the New Jersey Consumer Fraud Act "does not apply to claims based on allegations that a member of a regulated profession provided negligent or wrongful advice").

The Illinois Supreme Court provides a thorough discussion of this issue in the relatively recent case of *Cripe v. Leiter*, 184 Ill. 2d 185, 703 N.E.2d 100 (1998), *reh. denied* November 30, 1998, where the court considered whether actions for legal malpractice came within the gambit of the Illinois Consumer Fraud Act. The court explained in detail:

> "Our Consumer Fraud Act, like those discussed in the preceding cases from other jurisdictions, *contains no language expressly excluding or including the legal profession within its ambit*. Despite the absence of such language, there appears to be little dispute among the decisions addressing this issue that consumer protection statutes do not apply to claims arising out of the 'actual practice of law.'
> . . .
> "Historically, the regulation of attorney conduct in this state has been the prerogative of this court. [Citations omitted.] In the exercise of this power, this court administers a comprehensive regulatory scheme governing attorney conduct. The Illinois Rules of Professional Conduct adopted by this court set forth numerous requirements to which attorneys in this state must adhere. [Citation omitted.] Violation of these rules is grounds for discipline. This court has appointed an Attorney Registration and Disciplinary Commission (ARDC) to supervise the 'registration of, and disciplinary proceedings affecting, members of the Illinois bar.' [Citation omitted.] This court has also created a procedural scheme under which the ARDC operates, providing detailed regulations involving inquiry, hearing and review boards. [Citation omitted.] The purpose of this regulatory scheme is to protect the public and maintain the integrity of the legal profession. [Citation omitted.]
> . . . .
> "Accordingly, the attorney-client relationship in this state, unlike the ordinary merchant-consumer relationship, is already subject to extensive regulation by this court. The legislature did not, in the language of the Consumer Fraud Act, specify that it intended the Act's provisions to apply to the conduct of attorneys in relation to their clients. Given this court's role in that arena, we find that, *had the legislature intended the Act to apply in this manner, it would have stated that intention with specificity*. [Citation omitted.] *Absent a clear indication by the legislature, we will not conclude that the legislature intended to regulate attorney-client re-*

*lationships through the Consumer Fraud Act."* (Emphasis added.) *Cripe*, 184 Ill. 2d at 195-97.

See also *Evanston Hosp.*, 254 Ill. App. 3d at 443-44 (concluding that the Illinois Consumer Fraud Act covers neither actions for medical nor legal malpractice and that "[t]he Consumer Fraud Act 'is intended to reach practices of the type which affect consumers generally and is not available as an additional remedy to redress a purely private wrong' ").

Contrary to the persuasive reasoning of the above decisions dealing with similar consumer protection acts, the majority here finds that the KCPA *does* provide a remedy for patients against their health care providers, in addition to medical malpractice law.

The majority declines to recognize an exemption for health care professionals, despite the Kansas Legislature's extensive treatment of medical malpractice and the medical and other health care professions, in part because the KCPA contains other explicit exceptions and makes no mention of physicians or other health care professions. However, in my opinion this argument is not persuasive. All of the specific exemptions included in the KCPA and cited by the majority are for transactions that, absent the specific language of the legislature, would fit "comfortably" within the "consumer transaction" scheme of the KCPA. See K.S.A. 50-624(j) (stating that the term "supplier" does not include "any bank, trust company or lending institution which is subject to state or federal regulation with regard to disposition of repossessed collateral by such bank, trust company or lending institution"); K.S.A. 50-635 (excluding from actions under the KCPA "a publisher, broadcaster, printer or other person engaged in the dissemination of information or the reproduction of printed or pictorial matter so far as the information or matter has been disseminated or reproduced on behalf of others without actual knowledge that it violated the Kansas consumer protection act"); see also *Moore v. Bird Engineering Co.*, 273 Kan. 2, 11, 41 P.3d 755 (2002) (concluding that transactions with engineers are covered by the KCPA and stating that "[t]he comfortable fit of the present parties and transaction within the statutory definitions confirms the district court's impression that the KCPA applies").

Absent the majority's broadening of the KCPA to encompass the providing of medical care or treatment within a physician-patient relationship, I am of the opinion that there is no reasonable argument for subjecting a physician's or other health care professional's care or treatment to actions under the KCPA. Unlike banks, publishers, or engineers, the treatment provided by a health care professional to a patient does not "comfortably fit" within the consumer protection scheme. As the legislature has recognized, the practices of medicine and health care are both a science and an art. See K.S.A. 65-2801 *et seq.* Moreover, the legislature has by its extensive declarations in the public health sphere differentiated the practice of medicine from those of banks, publishers, or engineers. Thus, there was no need to specifically exclude a physician's or other health care professional's practice from the KCPA. Medicine has traditionally been included among the "learned professions." See *Moore,* 273 Kan. at 12. The *Moore* court explicitly and wisely declined to determine whether the "learned professions" should be exempt under the KCPA. 273 Kan. at 12. While such a blanket exclusion might not be warranted, "it would be improper to view the practice of medicine as interchangeable with other commercial endeavors and apply to it concepts that originated in other areas." *Nelson,* 222 Mich. App. at 83. I would therefore conclude that the legislature's explicit and expansive treatment of the medical and other health care professions in the Kansas statutes makes clear that it did not include the "actual practice of medicine" in the coverage of the KCPA.

## Consequences of the Majority's Decision

In my opinion, an appellate court reviewing the array of statutes involved in this case appropriately takes into consideration the consequences of the legislature's enactment. *State, ex rel., v. Throckmorton,* 169 Kan. 481, 486, 219 P.2d 413 (1950). In this regard, K.S.A. 65-4914 states that Kansas' public policy of providing acceptable health care for its citizens is best achieved "by requiring a system which combines a reasonable means to monitor the quality of health care with the provision of a reasonable means to compensate patients for the risks related to receiving health care ren-

dered by health care providers licensed by the state of Kansas." Thus, under the current statutory scheme, the legislature seeks to strike a reasonable balance between the public benefits of attracting (and keeping) high quality health care providers to the state and the private benefit of compensating individuals for injuries. The legislature explicitly states:

"Substantial increases in costs of professional liability insurance for health care providers have created a crisis of availability and affordability. *This situation poses a serious threat to the continued availability and quality of health care in Kansas.* In the interest of the public health and welfare, *new measures are required to assure that affordable professional liability insurance will be available to Kansas health care providers, to assure that injured parties receive adequate compensation for their injuries, and to maintain the quality of health care in Kansas."* (Emphasis added.) K.S.A. 60-3405.

This court, in reviewing the legislative history behind this statement, has previously found that the above policy "essentially adopted" in its 1986 amendments the conclusions of the Special Committee on Medical Malpractice, which found that "absent stabilization of malpractice insurance costs, Kansas physicians will not be willing to continue practicing in this state and that a failure to take legislative action in this area will affect health care delivery and availability in Kansas." *Bair v. Peck*, 248 Kan. 824, 832, 811 P.2d 1176 (1991).

The majority's opinion in this case, which finds a duplicate cause of action for medical negligence under the KCPA, in my opinion adopts an unreasonable conclusion that undermines these policy goals. There is no guarantee that actions brought under the KCPA will be covered by health care professionals' insurance policies for medical practice. As indicated above, there can be no doubt that the majority's conclusion will increase lawsuits brought by patients against their doctors, particularly since the KCPA requires no intent to defraud in order for courts to find liability. See K.S.A. 50-626.

The ultimate result of this increase in litigation will be an increased burden on the general public in terms of the cost of medical treatment and the deterrence of medical professionals from practicing in the state. See Comment, *Caps, "Crisis," and Consti-*

*tutionality-Evaluating the 1986 Kansas Medical Malpractice Legislation*, 35 U. Kan. L. Rev. at 763, 766-70 (1987). Thus, in my opinion the majority's decision undermines the specific goals of the legislature, contained in its expressed public policy of this state. Additionally, the majority's decision controverts the stated goal of the KCPA itself, which has at its heart the protection of consumers. See K.S.A. 50-623. The goal of both the consumer protection statutes and the numerous statutes regulating the practice of medicine and other health care professions is to protect the public—thus, to sacrifice public health and the quality of health care for the establishment of an additional mode of private recovery for patients under the KCPA "misses the point" of these enactments.

In my opinion, the majority's reading of legislative intent adversely impacts the *very thing* the legislature intended to accomplish in the KCPA, Chapter 65, and the statutes relating to medical malpractice insurance. See K.S.A. 40-3401 *et seq.*; K.S.A. 50-623 *et seq.*; K.S.A. 60-3401 *et seq.*; K.S.A. 65-2801 *et seq.* The physician-patient relationship does not fit "comfortably" within the framework of the KCPA. The legislature's expansive regulation of the medical and health care fields, as well as the requirement of malpractice insurance and continued balancing of the public and private interests involved, demonstrates to me that the legislature never intended for health care professionals to be covered by the KCPA.

In this case, Williamson has presented no evidence that the statements in question by Dr. Amrani to Williamson were made in the course of the "entrepreneurial" or "business activities" of Dr. Amrani's practice. The trial court below found that these statements "involve[] the professional aspect of a physician's practice as opposed to the proprietary, business aspects of the physician's practice." Because I would find that such actions are *not* covered by the KCPA for the reasons outlined above, I would affirm the decision of the trial court.

McFARLAND, C.J., joins in the foregoing dissenting opinion.