(181 P.3d 1277)
No. 97,057

MARIAN BONURA, as the Administrator of the ESTATE OF MARION BONURA; MARIAN BONURA, Individually and as Heir of the ESTATE OF MARION BONURA; LUIGI BONURA, Individually and as Heir of the ESTATE OF MARION BONURA; and FRANK BONURA, Individually and as Heir of the ESTATE OF MARION BONURA, *Appellants*, DENNIS ESSEN and THERESA ALLMAN, *Plaintiffs*, v. TIMOTHY L. SIFERS, as the Executor of the ESTATE OF TIMOTHY M. SIFERS, M.D., and TIMOTHY M. SIFERS, M.D., P.A., *Appellees*.

Opinion filed May 2, 2008.

*Leland F. Dempsey*, of Dempsey & Kingsland, P.C., of Kansas City, Missouri, for appellants.

*Sarah McLean Acosta* and *B.K. Christopher*, of Horn Aylward & Bandy, LLC, of Kansas City, Missouri, for appellees.

Before BUSER, P.J., GREEN and CAPLINGER, JJ.

GREEN, J.: Plaintiffs Marian Bonura (Mrs. Bonura), individually and as the administrator of the estate of Marion Bonura (Mr. Bonura), Luigi Bonura, and Frank Bonura appeal the trial court's decision granting summary judgment in favor of defendants Timothy L. Sifers, as the executor of the estate of Timothy M. Sifers, M.D., and Timothy M. Sifers, M.D., P.A. The plaintiffs contend that the trial court erred in refusing to toll the applicable statute of limitations for their claims alleging wrongful death, medical malpractice, fraud, and violations of the Kansas Consumer Protection Act (KCPA), K.S.A. 50-623 *et seq*. In addition, the plaintiffs challenge the trial court's ruling that the KCPA does not apply to a healthcare provider. Finding no reversible error, we affirm.

On November 13, 2000, Mr. Bonura viewed a television news report about a new weight-loss surgical procedure offered in the Kansas City area by Dr. Sifers. The news report called the procedure a "duodenal switch" and stated that Dr. Sifers was the only surgeon in the metropolitan area who performed the procedure. Mr. Bonura researched the duodenal switch procedure on the internet and became excited about the possibility of losing weight without dieting or exercise. The internet resources included in the record refer to the procedure alternately as "biliopancreatic diversion with duodenal switch" or simply "duodenal switch."

Some of Mr. Bonura's family members expressed reservations to Mr. Bonura about the surgical procedure, recalling Mr. Bonura's

problems with blood clots during an earlier surgery. Nevertheless, Mr. Bonura contacted Dr. Sifers about the weight-reduction surgery in December 2000. Mr. and Mrs. Bonura visited Dr. Sifers on January 8, 2001, for a surgical consultation.

During the consultation, Dr. Sifers explained three types of weight-loss surgeries, utilizing diagrams to demonstrate the differences. The surgical option recommended by Dr. Sifers was called a "duodenal switch." According to Mrs. Bonura, Dr. Sifers failed to review Mr. Bonura's medical history and to discuss any potential health risks or complications resulting from the surgery. In response to a specific inquiry by Mrs. Bonura, Dr. Sifers stated that Mr. Bonura's blood clotting history posed no danger. At the end of the consultation, Mr. Bonura scheduled surgery for January 15, 2001.

On January 15, before the surgery, Mr. Bonura signed a consent form which characterized the surgical procedure as a "duodenal switch." The hospital admission form also indicated that the scheduled operation was for a "duodenal switch." In contrast, the report summarizing the operation indicated that Dr. Sifers had performed a "bilipancreatic [sic] diversion."

Because Mr. Bonura developed breathing problems, he was placed on a respirator and, following surgery, was taken to the intensive care unit. A black liquid began to ooze out of Mr. Bonura's incision, as the result of a staph infection. Mr. Bonura stayed in the intensive care unit for 8 days. After the respirator was removed, Mr. Bonura was moved from the intensive care unit.

The following morning, January 26, 2001, Mr. Bonura died. The death certificate listed pulmonary embolism resulting from morbid obesity as the cause of death. Mrs. Bonura was not at the hospital when she received a phone call from Dr. Sifers. After that day, Mrs. Bonura never spoke with Dr. Sifers. Nevertheless, Mrs. Bonura did request Mr. Bonura's medical records. Mrs. Bonura, however, denied reviewing the medical records. On the other hand, Luigi examined the records and contacted an attorney within a few months of Mr. Bonura's death.

Nearly 3 years after Mr. Bonura's death, a reporter from The Pitch contacted Mrs. Bonura for an interview concerning Mr. Bon-

ura's surgery by Dr. Sifers. The reporter told Mrs. Bonura that other patients of Dr. Sifers had not received the duodenal switch procedure as they had requested. On February 26, 2004, the reporter published her article entitled, "The Deepest Cut," relating the account of Mr. Bonura's interest in weight-loss surgery and accusing Dr. Sifers of fraudulently promising the duodenal switch procedure but actually performing a biliopancreatic diversion procedure.

On November 1, 2004, the plaintiffs filed their first petition, which is not included in the record on appeal. Because Dr. Sifers had died, the trial court approved the substitution of Timothy L. Sifers as the executor of the doctor's estate. The plaintiffs then filed an amended petition, alleging three claims for medical negligence: (1) Dr. Sifers negligently performed a biliopancreatic diversion procedure rather than the authorized duodenal switch procedure; (2) Dr. Sifers failed to warn Mr. Bonura of the potential risks and complications attending the surgery; and (3) Dr. Sifers negligently conducted the actual weight-reduction surgery performed. The petition also raised a claim for wrongful death arising out of the same allegations of negligence and claims for fraud and violations of the KCPA.

As damages personal to Mr. Bonura, the Estate alleged that Mr. Bonura suffered (1) intra-abdominal and subcutaneous wounds, blood loss, ventilation problems, and pulmonary emboli; (2) various post-surgical complications; (3) pain, fever, abdominal swelling, mental anguish, and emotional distress; (4) a loss of enjoyment of life; and (5) a loss of income. Mr. Bonura's heirs claimed damages for (1) mental anguish, bereavement, loss of society, and loss of companionship; (2) loss of services, attention, filial care, and protection; (3) loss of financial support; (4) pain, mental anguish, and emotional distress; (5) medical expenses as the result of a prolonged hospitalization; (6) funeral expenses; (7) loss of enjoyment of life; and (8) loss of income.

The defendants' answer raised multiple affirmative defenses, including the statute of limitations. On November 23, 2005, the defendants moved for summary judgment, arguing, in part, that the plaintiffs' claims were barred by the applicable statutes of limita-

tions. The plaintiffs countered with motions to strike the defendants' motion for summary judgment and to equitably estop the defendants from raising the affirmative defense of the statute of limitations.

On January 30, 2006, the trial court filed its memorandum decision granting summary judgment to the defendants with respect to the wrongful death, medical malpractice, fraud, battery, and KCPA claims related to the death of Mr. Bonura. Essentially, the trial court ruled that the causes of action were reasonably ascertainable when Mr. Bonura died and, therefore, the commencement of the limitations period was not tolled.

*Did the Trial Court Correctly Determine That the Plaintiffs' Claims Were Barred by the Applicable Statutes of Limitations?*

Summary judgment is appropriate when the pleadings and pertinent discovery documents included within the appellate record reveal no material factual dispute which precludes judgment as a matter of law. When addressing a motion for summary judgment, therefore, this court, as well as the trial court, must resolve all facts and reasonable inferences supported by the evidence in favor of the party opposing summary judgment. In order to survive summary judgment, however, the party opposing summary judgment must demonstrate a disputed fact issue material to the resolution of the issues raised in the case. *Williamson v. Amrani*, 283 Kan. 227, 230, 152 P.3d 60 (2007).

Here, the trial court's decision rested primarily upon application of the applicable statutes of limitations. Once a defendant has established a prima facie showing that a particular claim was filed outside the limitations period prescribed by statute, the plaintiff bears the burden of demonstrating facts justifying the tolling of the limitations period in order to survive summary judgment. *Underhill v. Thompson*, 37 Kan. App. 2d 870, 875, 158 P.3d 987, *rev. denied* 285 Kan. 1177 (2007).

### A. Wrongful Death

A wrongful death action is a statutory creation designed to provide damages to heirs for the wrongful death of a decedent. K.S.A.

60-1901; see also *Mason v. Gerin Corp.*, 231 Kan. 718, 721, 647 P.2d 1340 (1982) ("[A] wrongful death action . . . is for the exclusive benefit of the heirs, and allows them to recover damages accruing after death for such things as loss of support, companionship and mental anguish."). Under K.S.A. 60-1901, an action for wrongful death must be premised upon an underlying cause of action the decedent would have been able to bring if he or she had survived. Therefore, a variety of theories may support a wrongful death action.

Regardless of the nature of the underlying claim, a wrongful death action is subject to a 2-year statute of limitations. K.S.A. 60-513(a)(5). Generally, the limitations period starts when the "fact of injury" is "reasonably ascertainable." Moreover, the "fact of injury" generally means the date of death. See *Davidson v. Denning*, 259 Kan. 659, 678, 914 P.2d 936 (1996) ("The limitations period should start on the date of death unless the information from which the fact of death or negligence can be determined was either concealed, altered, falsified, inaccurate, or misrepresented."). Nevertheless, the commencement of the limitations period may be tolled until the fact of the death or the wrongful nature of the death becomes reasonably ascertainable. K.S.A. 60-513(b) and (c).

In the present case, the record provides no dispute as to the "fact of injury": Mr. Bonura's death on January 26, 2001. Therefore, unless the wrongful nature of Mr. Bonura's death was not reasonably ascertainable when he died, the plaintiffs' initial petition, which was filed on November 1, 2004, was clearly outside the 2-year statute of limitations, and summary judgment would have been appropriate.

The "reasonably ascertainable" standard is objective. A plaintiff need not possess actual knowledge of an injury and its wrongful cause before the limitations period commences. Instead, the standard implies a duty to implement a reasonable investigation into the cause of the injury based upon the information available to the plaintiff. See *P.W.P. v. L.S.*, 266 Kan. 417, 424-25, 969 P.2d 896 (1998); *Davidson*, 259 Kan. at 678-79.

In *Davidson*, our Supreme Court reasoned that the date of death, in most cases, should start the limitations period:

"The term 'reasonably ascertainable' implies some obligation to investigate the factual sources available after a tragic death. The limitations period should start on the date of death unless the information from which the fact of death or negligence can be determined was either concealed, altered, falsified, inaccurate, or misrepresented. The fact of death should be a 'starting point for inquiry.' The wrongful death plaintiff is charged with constructive knowledge of information that is available through a reasonable investigation of sources that contain the facts of death and its wrongful causation.

. . . .

" 'Reasonably ascertainable' does not mean 'actual knowledge.' . . .

. . . .

"The discovery rule, as codified at K.S.A. 60-513(b) and (c), states that the limitations period starts when the 'fact of injury' is 'reasonably ascertainable.' The phrase 'reasonably ascertainable' means that a plaintiff has the obligation to reasonably investigate available sources that contain the facts of death and its wrongful causation." *Davidson*, 259 Kan. at 678-79.

Consequently, the fact of injury in most cases is the date of death.

In this appeal, the plaintiffs concede that the pertinent inquiry under the "reasonably ascertainable" standard is whether, under the circumstances, a plaintiff should have known that a death was caused by the wrongful conduct of a defendant. The plaintiffs further contend that concealment of medical records or a misrepresentation, alteration, inaccuracy, or falsification of any type justifies the tolling of the limitations period. The plaintiffs contend that Mr. Bonura's medical records contained inaccuracies, misrepresentations, and false information because the medical records indicated that Dr. Sifers had performed a duodenal switch, when, in fact, Dr. Sifers had not performed a duodenal switch.

Assuming for purposes of this appeal that Dr. Sifers' implementation of the biliopancreatic diversion procedure rather than the promised duodenal procedure was the proximate cause of Mr. Bonura's death, the plaintiffs' argument possesses validity only if the circumstances and information present when Mr. Bonura died would not have caused the plaintiffs to discover Dr. Sifers' alleged misconduct during the applicable limitations period after a reasonable investigation.

As the trial court noted, the medical records in this case contained Dr. Sifers' operative report, which characterized the procedure performed as a "bilipancreatic [*sic*] diversion." The plain-

tiffs argue that it is unreasonable to expect a layperson without medical training to ascertain that the wrong procedure was performed based upon one page of a medical file containing over 400 pages. The argument is attractive because it does seem unreasonable to expect an untrained person to review medical records and ascertain that a doctor had performed a different surgical procedure than the one promised. Nevertheless, if the characterization of the surgical procedure within the operative report was the only evidence that Dr. Sifers had performed a biliopancreatic diversion procedure rather than a duodenal switch procedure and the plaintiffs never discovered the existence of the operative report, the plaintiffs' claims for wrongful death, medical malpractice, fraud, and violations of the KCPA would suffer from a lack of proof.

The plaintiffs date their cause of action for wrongful death from The Pitch reporter's interview with Mrs. Bonura, arguing that the plaintiffs possessed no knowledge that Dr. Sifers had performed a biliopancreatic diversion procedure rather than the promised duodenal switch procedure until that interview. Actual knowledge, however, is not the measure by which a claim is determined to be reasonably ascertainable. *Davidson*, 259 Kan. at 678.

The only information provided by the reporter for The Pitch was that other patients of Dr. Sifers had discovered that their weight-loss surgeries had not involved the duodenal switch procedure as promised. Granted, this information likely induced the plaintiffs to investigate Mr. Bonura's medical records. But other than having an autopsy performed on Mr. Bonura's body to determine the kind of surgery actually performed, the information that Dr. Sifers had performed a different surgical procedure than the duodenal switch procedure would have most likely come from Mr. Bonura's medical records, of which the plaintiffs were charged with constructive knowledge as of the date of Mr. Bonura's death. See *Davidson*, 259 Kan. at 678 ("The wrongful death plaintiff is charged with constructive knowledge of information that is available through a reasonable investigation of sources that contain the facts of death and its wrongful causation.").

When the plaintiffs filed suit in this case, they presumably relied on expert medical advice concerning the procedures performed in

this case. For example, the plaintiffs' expert, Dr. Robert Rabkin, testified in his deposition that he reviewed and relied upon the plaintiffs' medical records in determining that Dr. Sifers did not meet the appropriate standard of medical care in the case. Clearly, the medical records apparently furnished sufficient evidence for a medically trained individual to evaluate Dr. Sifers' conduct. There is no indication that these medical records were not available to the plaintiffs either when Mr. Bonura died or shortly after his death. As a result, a reasonable investigation into Mr. Bonura's death by obtaining a medical review of Mr. Bonura's records would have revealed Dr. Sifers' purported misconduct.

Citing *Jones v. Neuroscience Assocs., Inc.*, 250 Kan. 477, 827 P.2d 51 (1992), the plaintiffs further contend that they should not have been required to impair the physician-patient relationship by immediately inquiring into the decedent's cause of death for potential malpractice claims. Notably, *Jones* involved a "continuous treatment" case, which is far different than this case because Mr. Bonura died shortly after surgery. Mr. Bonura's sudden death prevented decedent from having a continuing relationship with Dr. Sifers. As a result, the *Jones* decision is distinguishable from this case.

A physician's wrongful conduct that causes a death is not reasonably ascertainable merely because a review of available medical records by a person with medical knowledge would disclose the wrongful conduct. See *Davidson*, 259 Kan. at 675 (discussing this court's characterization of the trial court's decision). Yet, where specific circumstances suggest that the death was caused by the physician's wrongful conduct, a reasonable investigation into the death might include a medical review of the deceased's medical records.

For example, in *Friends University v. W.R. Grace & Co.*, 227 Kan. 559, 563-64, 608 P.2d 936 (1980), which was discussed in *Davidson*, our Supreme Court refused to toll the statute of limitations until the date the university hired an expert and learned of the actual cause of the library's leaking roof. The court reasoned that the expert hired to ascertain the cause of the leaking roof could have been hired at any time after the university became aware of

the problem. In other words, under the circumstances of the case, a reasonable investigation of the injury, that is, water leaking into a building after a new roof had been installed, included hiring an expert to determine the cause.

Similarly, where a plaintiff possesses identifiable facts indicating an unexpected death is the result of misconduct by a physician, the law imposes a duty to implement a reasonable investigation into the cause. If necessary to determine causation, the reasonable investigation might include seeking review of medical records by a person with medical knowledge.

In the present case, the undisputed evidence demonstrates that the plaintiffs suspected, or should have suspected, that Dr. Sifers' alleged wrongful conduct contributed to Mr. Bonura's death. During the initial consultation, Dr. Sifers failed to tell Mr. Bonura of any potential risks or adverse consequences which might arise from the surgery. Dr. Sifers further dismissed Mrs. Bonura's concerns about blood clots. After the surgery, Mr. Bonura suffered a staph infection, required the assistance of a respirator, stayed in the intensive care unit for 8 days, and never fully regained his strength. Mr. Bonura died from blood clots (pulmonary embolism), which Dr. Sifers had assured Mrs. Bonura would not pose a problem during the surgery.

Under these circumstances, a reasonable plaintiff should have suspected some wrongful conduct by Dr. Sifers. In fact, the plaintiffs in this case requested Mr. Bonura's medical records shortly after his death. One of the plaintiffs reviewed the medical records and contacted an attorney. This evidence indicates that the plaintiffs were suspicious of Dr. Sifers' role in Mr. Bonura's death.

Moreover, within the discussion of the fraud claim in the plaintiffs' brief on appeal, the plaintiffs acknowledge that they had contacted an attorney following Mr. Bonura's death but that the attorney did not pursue a claim because there was no evidence of negligence or fraud ascertainable from the medical records. The record, however, discloses only that the plaintiffs had contacted an attorney; it does not indicate that the plaintiffs had pursued the claim and had obtained a consultation by an attorney. The plaintiffs' statement in the brief to the contrary is not supported by a

citation to the record on appeal and, therefore, is deemed to be without evidentiary support. Supreme Court Rule 6.02(d) (2007 Kan. Ct. R. Annot. 37).

Based upon the evidence included within the appellate record, the plaintiffs knew or should have known that Dr. Sifers' claimed wrongful conduct contributed to Mr. Bonura's death. The fact that the extent or precise nature of Dr. Sifers' alleged misconduct was not known does not affect our consideration of whether the wrongful death claim was reasonably ascertainable when Mr. Bonura died. *P.W.P.*, 266 Kan. at 425 ("[T]he objective knowledge of the injury, not the extent of the injury, triggers the statute [of limitations] both in medical and nonmedical malpractice cases.").

Moreover, Dr. Sifers' alleged misconduct is distinguishable from the misconduct noted in this court's recent decision in *Dreiling v. Davis*, 38 Kan. App. 2d 997, 176 P.3d 197 (2008). In *Dreiling*, a patient died following gallbladder surgery. The treating physician listed the cause of death as " 'acute/fulminant liver failure' " with a secondary diagnosis of nodular cirrhosis. The funeral director discouraged the patient's heir from seeking an autopsy, indicating a belief that the procedure would not be helpful. Although the plaintiff began an investigation into the cause of death, several attorneys indicated that they could not establish wrongful causation. Finally, one set of attorneys suggested that the decedent's body be exhumed and an autopsy be performed. The later autopsy suggested a different cause of death—acute progressive pulmonary disease and acute bronchopneumonia—which established a claim for negligent post-operative care.

In reversing the trial court's decision granting summary judgment in favor of the defendant due to the statute of limitations, this court determined that summary judgment was not appropriate because, although the plaintiff clearly possessed suspicion regarding the wrongful nature of the death, the cause of action was not ascertainable until the autopsy was performed. The court concluded that whether a 5-month delay in seeking the autopsy was reasonable under the circumstances presented a material question of fact. 38 Kan. App. 2d at 1003-04.

In the present case, the plaintiffs obtained no new medical information after Mr. Bonura's death establishing the existence of a cause of action, which could not have been determined from existing medical records when Mr. Bonura died. There is no question concerning the reasonableness of the plaintiffs' investigation in this case because the record reveals that the plaintiffs did not perform any significant investigation at all until after Mrs. Bonura's interview with the reporter from The Pitch.

In summary, Dr. Sifers' claimed misconduct could have been determined from the medical records existing when Mr. Bonura died. Plaintiffs do not allege that Mr. Bonura's medical records were in any way concealed or falsified by medical personnel after his death. Mrs. Bonura learned that Mr. Bonura had died from a pulmonary embolism on January 26, 2001, the date of his death. The plaintiffs do not contend that anything changed in this case between that date and January 26, 2003, the date the action needed to be filed to come within the applicable statute of limitations. But see *In re Swine Flu Products Liability Litigation*, 764 F.2d 637, 640-41 (9th Cir. 1985) (where a coroner had led decedent's husband to believe that his wife's death was not caused by the swine flu vaccine raised a substantial issue of material fact as to when the husband should have reasonably discovered the cause of his wife's death). The plaintiffs do not allege that the defendants used the kind of concealment or deception demonstrated in the swine flu case to cause the plaintiffs to let the limitations period lapse.

In addition, the evidence shows that the plaintiffs were suspicious about Mr. Bonura's sudden death. Like the plaintiff in *Davidson*, the plaintiffs contacted an attorney and obtained a copy of Mr. Bonura's medical records shortly after his death. Indeed, Mr. Bonura died from a risk that Dr. Sifers had assured Mrs. Bonura would not pose a problem during the surgery. As a result, it would have been reasonable for plaintiffs to have consulted other medical or legal personnel to investigate the cause of his death, particularly when the death certificate showed that decedent had died from a risk that the doctor had earlier minimized when discussing the surgical procedure to be performed.

As a result, a reasonable investigation into Mr. Bonura's death would have revealed the claimed wrongful conduct of Dr. Sifers within the 2-year limitations period for wrongful death. Because the plaintiffs have failed to bring suit within 2 years of Mr. Bonura's death, the trial court properly granted the defendants' motion for summary judgment.

### B. Medical Malpractice.

Under K.S.A. 60-1801, a cause of action for personal injury to a person survives the death of that person. Such an action, which is personal to the decedent, may be brought on behalf of the decedent's estate by a personal representative. *Mason*, 231 Kan. at 721 ("A survival action allows the personal representative to recover damages accrued by the injured party between the date of injury and death for the benefit of the decedent's estate."). The plaintiffs alleged separate claims for medical malpractice, fraud, battery, and violations of the KCPA to compensate the estate for injuries Mr. Bonura suffered before his death.

The plaintiffs originally pursued three bases for medical malpractice: (1) Dr. Sifers performed the biliopancreatic diversion procedure rather than the duodenal switch procedure Mr. Bonura had authorized him to perform; (2) Dr. Sifers failed to warn Mr. Bonura of the potential risks and consequences attending the surgical procedure; and (3) Dr. Sifers negligently performed the biliopancreatic diversion procedure.

Although the plaintiffs mention the other bases for medical malpractice, their appellate brief is devoted solely to arguing that Dr. Sifers had intentionally misrepresented the weight-loss procedure that he would perform on Mr. Bonura. Consequently, we deem the other bases for medical malpractice abandoned. *In re K.M.H.*, 285 Kan. 53, 82, 169 P.3d 1025 (2007) (failure to brief an issue is deemed an abandonment of the claim).

A medical malpractice claim is subject to the same 2-year limitations period and discovery rule discussed in the analysis of the wrongful death claim. See K.S.A. 60-513(a)(4) and (c). Therefore, the evidence establishing that Dr. Sifers negligently performed a surgical procedure which Mr. Bonura did not authorize was rea-

sonably ascertainable at the time of Mr. Bonura's death. For all of the reasons previously discussed, this medical malpractice claim was also barred by the statute of limitations, and the trial court did not err in granting the defendants' motion for summary judgment.

## C. Fraud.

K.S.A. 60-513(a)(3) provides that an action for fraud must be brought within 2 years but that "the cause of action shall not be deemed to have accrued until the fraud is discovered." Our Supreme Court has interpreted "discovered" to mean that a cause of action for fraud accrues when the defrauded party possesses actual or constructive notice of the fraud or when, with reasonable diligence, the fraud could have been discovered. *Miller v. Foulston, Siefkin, Powers & Eberhardt*, 246 Kan. 450, 465, 790 P.2d 404 (1990).

The plaintiffs' claim for fraud is identical to the wrongful death and medical malpractice claims raised in this appeal. The plaintiffs, for example, maintain in their fraud claim that Dr. Sifers had intentionally misrepresented that he would perform a duodenal switch procedure knowing that the actual procedure performed would be a biliopancreatic diversion procedure. They alleged that this misrepresentation caused Mr. Bonura to endure the following: significant health problems, significant lost wages, and substantial hospital bills. In addition, the misrepresentation was alleged to have brought about his death. Accordingly, it is apparent that the distinction between the fraud claim and the medical malpractice claim is nonexistent. See *Bonin v. Vannaman*, 261 Kan. 199, 210, 929 P.2d 754 (1996).

In a medical malpractice action involving an issue of whether the cause of action was properly brought as a malpractice or a fraud action, the *Bonin* court stated:

"It is true that Dr. Vannaman's alleged conduct fulfills all of the elements of fraud by silence under PIK Civ. 2d 14.42, just as the Med Center's actions in *Malone* fulfilled all of the elements of a breach of contract. However, Dr. Vannaman's alleged conduct was also proscribed by a legal duty which he had an obligation to uphold. When it is alleged that such legal duty is violated, the law has classified the cause of action created by this breach as a form of negligence called malpractice, not as fraud or breach of contract, even if the violation of such duty also

technically fulfills the elements of fraud or breach of contract. Amanda does not allege a valid claim of fraud against Dr. Vannaman.

"This does not mean that a doctor can never be liable for fraud or breach of contract. Instead, this simply means that a fraud or breach of contract cause of action can only be based upon a physician's misconduct if that misconduct is beyond a breach of the legal duty which every doctor has the obligation to uphold." 261 Kan. at 210.

Although the plaintiffs' brief provides little analysis, the plaintiffs apparently contend that Dr. Sifers' purported misconduct goes beyond a breach of his ordinary duty under the law. The plaintiffs seem to premise their claim upon this court's decision in *Robinson v. Shah*, 23 Kan. App. 2d 812, 936 P.2d 784 (1997). Nevertheless, *Robinson* is clearly distinguishable from the facts of the present case.

In *Robinson*, the physician had a continuing professional relationship with the patient. In 1983, the physician performed abdominal surgery on the patient, who subsequently began to experience abdominal distress. The patient returned to the physician to report her discomfort, and the physician ordered x-rays. The x-rays revealed that the physician had left surgical sponges in the patient's abdomen during surgery, but, instead of informing the patient what the x-ray slides revealed, the physician told the patient that nothing unusual was indicated by the slides and that the patient did not require further treatment. Over the next several years, despite continued discomfort, the patient continued to seek treatment from her treating physician, who never reported the presence of the surgical sponges. Eventually, the patient sought medical treatment from other physicians who could not diagnose the cause of the patient's pain until another set of x-rays was ordered which immediately revealed the presence of the surgical sponges.

In distinguishing the physician's fraud claim from the underlying medical malpractice claim, the *Robinson* court noted that the physician concealed the malpractice by misrepresenting the results of the x-rays and by leading the patient to believe that further medical treatment was not necessary, even though the physician was aware of the presence of the sponges. The court further noted that, in nonmedical contexts, Kansas law has permitted a party who has

been deprived of a cause of action through the fraud of another party to maintain a cause of action against the perpetrator of the fraud for damages resulting from the lost cause of action. *Robinson*, 23 Kan. App. 2d at 818 (citing *Clark v. Amos*, 114 Kan. 115, 116, 58 P.2d 81 [1936]). The *Robinson* court determined that a similar rule should be applied when the perpetrator of the fraud is a doctor:

"We hold that where a patient has a cause of action against a physician for malpractice and has been duped by the intentional and knowing lies of the physician to the extent the patient in reliance on the fraudulent misrepresentation permits the statute of limitations to bar his or her action, the patient can maintain an action for fraud against the physician, not on account of the original negligence or malpractice but on account of the fraudulent actions of the physician which deceived the patient with the consequence that the time bar ran against the original action." *Robinson*, 23 Kan. App. 2d at 824.

The plaintiffs contend that Dr. Sifers failed to acknowledge his fraud in performing the wrong surgical procedure and, therefore, the concealment continued until the reporter from The Pitch revealed the fraud. This argument misstates the holding of *Robinson*, which requires a plaintiff to establish two separate instances of misconduct: one forming the original cause of action and the other in concealing or misrepresenting the facts that would allow the plaintiff, exercising reasonable diligence, to detect the underlying tortious conduct.

Here, the plaintiffs' claim for fraud is the same conduct supporting the medical malpractice and wrongful death claims. There is no additional fraudulent act by Dr. Sifers upon which the plaintiffs had reasonably relied until the statute of limitations lapsed. The plaintiffs never questioned Dr. Sifers about the surgery. In fact, Mrs. Bonura testified that she never spoke with Dr. Sifers again after the phone call informing her that her husband had died. This factual distinction was pointed out by the trial court in this case:

"This Court believes the facts in the present case are sufficiently different to warrant a different result than the result in *Robinson*. As noted above, although there is substantial competent evidence that Dr. Sifers represented to Mr. Bonura and his wife that he would perform a duodenal switch, and then performed a bilipancreatic [*sic*] diversion instead; the 'Operative Report' states a 'bilipancreatic

[*sic*] diversion' was performed. Also, there is no evidence presented to this Court that following the surgery, Dr. Sifers affirmatively represented to plaintiffs that he had performed a duodenal switch. Again, it can certainly be argued that his failure to disclose that he performed a bilipancreatic [*sic*] diversion rather than a duodenal switch constitutes concealment. However, the conduct of Dr. Sifers is not equivalent to the conduct of Dr. Shah. *Certainly, this Court might reach a different conclusion if the facts were that following the surgery, Dr. Sifers affirmatively told plaintiffs that he had in fact performed a duodenal switch.* In other words, this case might be equivalent to *Robinson*, if the facts were that plaintiffs read the operative report, saw bilipancreatic [*sic*] diversion, questioned Dr. Sifers about this, and he told them it was a clerical error and that he had in fact performed a duodenal switch, or *that bilipancreatic [sic] diversion and duodenal switch were just different names for the same procedure.*" (Emphasis added.)

For similar reasons, the present case is legally distinguishable from *Thomas v. Sifers*, 535 F. Supp. 2d 1200 (D. Kan. 2007), which the plaintiffs furnished by letter of additional authority under Supreme Court Rule 6.09(b) (2007 Kan. Ct. R. Annot. 45). Although *Thomas* involved the same doctor making the same misrepresentation regarding the surgical procedure he had performed as in the present case, the plaintiff in *Thomas* confronted Dr. Sifers about the symptoms she had experienced following the surgery and also noted that Dr. Sifers had characterized the procedure as "BPD" on occasion. In denying the defendants' motion for summary judgment on the fraud claim, the *Thomas* court opined:

"[V]iewing the record in the light most favorable to Ms. Thomas, Dr. Sifers lulled her into confidence from pursuing any further investigation into the matter by virtue of their interactions during fifteen follow-up visits over three and a half years. He had numerous opportunities to tell her that he had not performed the duodenal switch procedure on her, a procedure that allegedly would have avoided the vast majority of her symptoms. Instead, he affirmatively told her that he used the term [biliopancreatic diversion] as representing the [duodenal switch] procedure and he told her that the various unanticipated symptoms she was experiencing were either normal or not side effects of her weight loss surgery, and that she should check her family history for an explanation. A rational trier of fact could also discount defendants' reliance on the references to BPD and biliopancreatic diversion contained in plaintiff's medical records for at least two reasons. First, plaintiff has stated that she did not review the medical records but rather obtained them at the request of her disability attorney and, upon receipt, she simply forwarded them on to her attorney. Second, Dr. Sifers essentially told plaintiff that he did not use any distinction between the different types of terminology. Given the sophisticated medical terminology associated with the various

procedures along with Dr. Sifers' repeated assurances to Ms. Thomas that her various symptoms were not attributable to the surgery, then, the issue of when Ms. Thomas could have discovered with reasonable diligence that she did not receive the duodenal switch procedure originally promised to her by Dr. Sifers is a question of fact." 535 F. Supp. 2d at 1206-07.

To extend the holding in *Robinson* as urged by the plaintiffs would effectively vitiate the statute of limitations in any fraud claim. The concealment which the plaintiffs contend tolls the running of the statute of limitations is the wrongful act providing the basis for their claim. The statute of limitations, however, commences when the fraud, with reasonable diligence, could have been discovered. *Miller*, 246 Kan. at 465. Based upon the foregoing analysis of the wrongful death claim, Dr. Sifers' alleged fraudulent conduct could have been discovered either when Mr. Bonura died or shortly after his death. Because the statute of limitations had run in this matter, summary judgment was appropriate.

### *D. Battery.*

The plaintiffs' petition included a claim for battery. The trial court ruled that a battery claim was subject to a 1-year statute of limitations and that the limitations period was not subject to a discovery provision. The plaintiffs have not briefed an argument challenging this determination; therefore, the claim is deemed abandoned. *In re K.M.H.*, 285 Kan. at 82.

### *E. KCPA Violation.*

The plaintiffs also contend that the trial court erred in finding that the 3-year statute of limitations had run on the plaintiffs' claim that Dr. Sifers had violated the KCPA. The trial court ruled that a claim arising under the KCPA is subject to the 3-year statute of limitations of K.S.A. 60-512(2) but that K.S.A. 60-512(2) does not provide a discovery provision allowing a claim under the KCPA to be tolled.

Challenging the trial court's ruling, the plaintiffs contend that "Kansas courts have consistently held that the discovery rule applies to the KCPA." In support, the plaintiffs cite *Kelly v. Primeline Advisory, Inc.*, 256 Kan. 978, 889 P.2d 130 (1995), and several

federal court decisions. *Kelly* interpreted the Kansas Securities Act, not the KCPA. Furthermore, a Kansas state court is not bound by a federal court's interpretation of Kansas law, and our Supreme Court is the final authority on Kansas law for all state and federal courts. *KPERS v. Reimer & Koger Assocs., Inc.*, 262 Kan. 635, 669-70, 941 P.2d 1321 (1997).

Although our Supreme Court has not addressed whether a discovery provision is applicable to a fraud-based claim under the KCPA, this court has uniformly refused to apply a tolling provision to claims brought under the KCPA. See *Four Seasons Apts. v. AAA Glass Service, Inc.*, 37 Kan. App. 2d 248, 250-51, 152 P.3d 101 (2007); *Dusek-Higgins v. McComb*, No. 95,611, unpublished opinion filed August 24, 2007, *rev. denied* 285 Kan. 1173 (2007); *Johnsmeyer v. Hanover Development Co. II*, No. 93,158, unpublished opinion filed October 7, 2005.

Nevertheless, for purposes of this appeal, we need not determine whether a discovery provision ought to apply to fraud-based claims under the KCPA. Even if a discovery provision were applied, the circumstances of this case show that the claim for a violation of the KCPA was reasonably ascertainable upon Mr. Bonura's death. Because the petition was filed more than 3 years from the date of Mr. Bonura's death, the discovery provision, if applicable, would not save the plaintiffs' claim in this case.

## F. Equitable Estoppel.

The plaintiffs additionally contend that the trial court improperly refused to apply the doctrine of equitable estoppel against the defendants' attempts to raise the statute of limitations as an affirmative defense.

"The doctrine of equitable estoppel has been frequently used to prevent a defendant from relying on the statute of limitations as a defense where the defendant's fraudulent or wrongful conduct has caused the plaintiff not to file suit within the period of the statute of limitations. [Citation omitted.]

"We conclude this is an appropriate case for application of the doctrine of equitable estoppel. We hold that the defendant in a malpractice case cannot take advantage of a defense based on the statute of limitations or the statute of repose where the defendant's own fraudulent concealment has resulted in the delay in discovering the defendant's wrongful actions. Under such facts, a defendant is

equitably estopped from raising the defenses of statute of limitations and the statute of repose. [Citation omitted.]" *Robinson*, 23 Kan. App. 2d at 832.

This malpractice claim is indistinguishable from the plaintiffs' fraud claim and, for similar reasons, does not entitle the plaintiffs to relief. Under the circumstances presented in this case, it was not Dr. Sifers' purported wrongful conduct which prevented the plaintiffs from ascertaining their claims within the applicable statute of limitations but the plaintiffs' failure to conduct a reasonable investigation of Mr. Bonura's death. Consequently, the doctrine of equitable estoppel was not warranted in this case. The trial court properly rejected the plaintiffs' attempts to invoke the doctrine.

*Does the KCPA Encompass Deceptive Acts by Medical Providers?*

The plaintiffs' only other issue in this appeal concerns the trial court's ruling that a physician's services did not fall within the scope of the KCPA, and, consequently, a physician could not be sued under the KCPA. The defendants acknowledge that our Supreme Court has specifically addressed this question and ruled that a physician is subject to the provisions of the KCPA. See *Williamson v. Amrani*, 283 Kan. 227, 152 P.3d 60 (2007). Nevertheless, the defendants argue that *Williamson* should not be given retroactive application.

Because the trial court properly concluded that a claim for a violation of the KCPA was barred by the statute of limitations, the parties' arguments concerning the application of *Williamson* is moot. *In re Adoption of B.G.J.*, 281 Kan. 552, 566, 133 P.3d 1 (2006) (noting that a court does not provide opinions upon moot questions or abstract propositions which cannot have an effect upon the matters before the court). Accordingly, this issue is dismissed.

Affirmed.